Filed 6/8/15

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                                    )
                                               )
           Plaintiff and Respondent,     )
                                                 )                  S064858
                  v.                             )
                                                 )
ROYCE LYN SCOTT,                        )
                                               )        Riverside County
           Defendant and Appellant.      )   Super. Ct. No. CR 16374
_____)

      **THE COURT.**[*]

      Following a jury trial on a 15-count indictment, defendant Royce Lyn Scott was convicted of sexually assaulting and murdering 78-year-old Della Morris in her home.  Specifically, Scott was convicted of the first degree murder of Morris (Pen. Code, § 187, subd. (a); count 4), burglary (*id.*, § 459; count 1), and the rape and sodomy of Morris (*id.*, §§ 261, subd. (a)(2), 286, subd. (c); counts 2 and 3).  (All undesignated statutory references are to the Penal Code.)  The jury found true the burglary, rape, and sodomy special circumstance allegations.  (§ 190.2, subd. (a)(17)(G), (C), (D).)  The trial court found that Scott had one prior serious

_____

       [*]      Cantil-Sakauye, C. J., Werdegar, J., Chin, J., Corrigan, J., and Cuéllar, J.

felony conviction (§ 667) and had served one prior prison term (§ 667.5, subd. (b)).

Before trial, the trial court granted Scott's motion under section 995 to set aside the burglary charge in count 5. In addition, Scott had pleaded guilty to four counts of burglary (§ 459; counts 6 through 9), two counts of second-degree robbery (§ 211; counts 10 and 11), two counts of assault with force likely to produce great bodily injury (§ 245, subd. (a)(l); counts 12 and 13), and two counts of battery (§ 242; counts 14 and 15). The charges in counts 6 through 15 concerned separate burglaries committed after the charged murder. Scott admitted the personal use of a deadly weapon allegations as to counts 9 through 12. (§ 12022, subd. (b).)

After a penalty trial, the jury returned a verdict of death. The trial court denied Scott's automatic application to modify the penalty verdict (§ 190.4, subd. (e)) and sentenced him to death on count 4. The court dismissed counts 14 and 15 under section 1385 and imposed a determinate sentence of 35 years and eight months on the remaining charges and allegations.

This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS

### A. Guilt Phase

#### 1. Prosecution Evidence

##### a. The Murder of Della Morris

Della Morris (Morris) lived in Palm Springs with her brother, Webbie Morris (Webbie). On Thursday, July 9, 1992, Webbie went to bed around 10:00 p.m., while Morris watched television in the living room. When Webbie woke up the next morning around 8:00 a.m., he found her dead in her bedroom. He saw

2

blood on the bed and underneath her body, and he noticed that the sliding door to his room and the one in the living room were open. A VCR and Webbie's wallet were missing.

### b. Investigation

Around 8:15 a.m., police arrived at the Morris residence. They found no indication of forced entry or a struggle in Morris's bedroom.

Warren Horton, a deputy coroner with the Riverside County coroner's office, examined Morris's body at the scene. He observed two small bruises under her right eye. Horton rolled her body over and saw a small amount of blood underneath her vaginal area. The blood appeared dried and had stained Morris's buttocks and the bedsheet. Horton found a small hair directly underneath her pubic area that did not appear to be consistent with her pubic hair.

Darryl Garber, a forensic pathologist and independent contractor with the County of Riverside, performed an autopsy. Garber found multiple abrasions and contusions on the right side of Morris's face, left nostril, and left anterior neck. He also found pinpoint hemorrhages in her eyes consistent with strangulation or smothering. Inside Morris's mouth, Garber found evidence of bruising on her cheek and tongue associated with smothering. Garber also found evidence of traumatic sexual assault, including contusions to Morris's vaginal area and abrasions to, and signs of dilatation of, her anus. Garber opined that the sexual assault occurred before death and that she died from strangulation and smothering.

Garber used a sexual assault kit to gather evidence from Morris's body, taking swabs from her mouth, vagina, and rectum, and collecting fingernail clippings and hair samples from her head and pubic area.

Ricci Cooksey, a senior criminalist with the state Department of Justice, examined the contents of the sexual assault kit, blood samples taken from Morris,

3

and bedding obtained during the investigation. Cooksey found sperm cells on the vaginal and rectal swabs and two stains on a bedsheet.

On November 4, 1992, police arrested Scott during a burglary of the home of Kenneth Osburn and Jeffrey Cole, which is discussed below. While Scott was in custody, Heather Gunkel, a registered nurse and independent contractor with the Palm Springs Police Department, used a sexual assault kit to collect blood, saliva and hair samples, including pubic hair, from Scott.

Cooksey typed Scott's blood, saliva, and hair samples, and analyzed the hair samples and hair taken from the murder scene. Cooksey opined that four hair strands taken from the crime scene were consistent with and could have come from Scott's pubic area and that there were no major discrepancies between the crime scene hairs and Scott's. The crime scene hairs did not come from Morris or Webbie.

Donald Jones, a criminalist with the San Bernardino Sheriff's Department crime laboratory, performed RFLP (restriction fragment length polymorphism) analysis on DNA extracted from the blood samples taken from Morris and Scott, the sperm cells found on the vaginal and rectal swabs obtained from Morris, and the sperm cells found on the two stains on the bedsheet. Jones concluded that the DNA extracted from the vaginal swabs and from each of the stains on the bedsheet came from a single donor, and that the DNA profile of each of these samples matched Scott's. Jones testified that the DNA was "130 million times more likely to come from [Scott] than it is from any other black chosen at random in the population."

4

### c. Other Burglaries Nearby

Scott pleaded guilty to each of the nearby Palm Springs burglaries described below. Evidence of each crime was admitted in the guilt phase for the limited purpose of showing his intent to burglarize Morris's house.

Around 2:30 a.m. on August 3, 1992, Dorothy Nancy Pruss heard a rustling noise near her kitchen. Pruss was not certain whether she had locked the sliding glass door near the kitchen that led outside. She checked the house and saw Scott inside, holding her purse and fanny pack. Both items had been on a dining room chair near the sliding glass door. Scott asked Pruss to tell him where her money was. Press said she had no money and screamed. After Pruss's roommate ran out of her bedroom and confronted Scott, he ran out of the house through the sliding glass door near the kitchen, taking the purse and fanny pack with him.

Around midnight on August 9, 1992, Marc Daley had just returned home when he saw that the sliding screen door in the kitchen area was open. The door had been closed when he left earlier that evening. Daley walked through the house and discovered Scott behind the door of a bedroom. Scott said that he did not want to hurt Daley and that he only wanted his money. Daley ran to his neighbor's house, and Scott fled the scene. When Daley returned to his house, he noticed the sliding glass door in the master bedroom was open. The door had been closed the last time he had seen it. A television had been moved in the bedroom where Daley had seen Scott. A fingerprint obtained from the television matched Scott's.

Around midnight on August 25, 1992, Emily Pollard was watching television in her living room when she heard a large crash. Pollard saw Scott in her kitchen, screamed, and ran to a neighbor's house. When she returned to her house the following morning, her purse and a camera were missing; she had last

5

seen both items on the kitchen counter.  The sliding glass door that led from the kitchen to the backyard had been smashed.

Around 12:50 a.m. on November 4, 1992, Kenneth Osburn and Jeffrey Cole were in their den watching television when Osburn heard the sliding glass door that led from the dining room to the outside of the house open.  Osburn saw Scott standing in the dining room.  Scott ordered him and Cole to get down on the floor, and they complied.  Scott took Osburn's wallet and went into the kitchen.  He said he was going to take the microwave oven and told Osburn and Cole to "stay put."  Minutes later, police apprehended Scott in the house and found Osburn's wallet in Scott's possession and a microwave oven in the backyard.

### 2. *Defense Evidence*

For a few weeks in July 1992, Scott lived with his stepsister, Audrey Mickens.  Occasionally, Scott stayed out all night.  Mickens did not recall whether Scott was home on the morning of July 10, 11, or 12.

In September 1992, Detective Barry Dallas received a report from Cooksey that listed the names of 19 paroled registered sex offenders who had the same genetic markers as the semen that was found on Morris's sheets.  Ten of those individuals were black.  In his police reports, Dallas did not refer to the list of 19 names submitted by Cooksey.  He put the list into a folder or case file and forgot about it.  Dallas provided the prosecution with the list during trial.

## B.  Penalty Phase

### 1. *Prosecution Evidence*

The prosecution introduced evidence of the following prior unadjudicated offenses involving force or violence, or the threat to use force or violence, within the meaning of section 190.3, factor (b).

6

On November 4, 1992, during the burglary of Osburn and Cole, Scott kicked Osburn in the ribs, stomped on Cole's back, and hit Cole with a fireplace poker.  After putting the microwave oven outside, Scott returned and stomped on Osburn's back and hit and kicked Cole.  Scott demanded money, and Osburn put his wallet on the coffee table.  Osburn and Cole were very afraid and thought they were going to die.  Scott threatened to kill Cole and told him that he (Scott) was going to stick Cole with the fireplace poker, which he held over Cole's head.  Scott had the poker in his hands when the police arrived.

In March 1988, Thomas Meyer and Dan King worked and lived at a construction site in Palm Springs.  One night, they were awakened in their camper when Scott confronted them through a screen door and demanded money.  Meyer threw his jacket to Scott, who remained outside.  After finding no money in it, Scott became agitated, banged on the doorsill, and said, "I have a double barreled sawed off shotgun here, and I am going to blow your mother fucking head off if you don't give me some money now."  King took a gun which he kept under his pillow and fired four shots at Scott.  Meyer thought Scott had returned fire from a shotgun.  Scott appeared to be injured and was rolling on the ground about 10 feet from the door.  He said, "God.  I am never going to do this again."  Meyer and King left the camper, and within minutes, the police arrived and arrested Scott.

The prosecution presented victim impact evidence through the testimony of Morris's nephew, Raymond Abelin.  Morris was more like a mother to him than an aunt.  Dancing was everything to her, and she enjoyed choreographing and teaching dance.  Before moving to Palm Springs, Morris lived in Los Angeles where she organized theatrical shows at venues such as the Wilshire Theatre, Los Angeles Street Scene Festival, and various fairs and parties.  Dancing was a family business, and Morris was in charge of the productions.  Morris inspired many people, including Abelin, to study and become involved in the arts.

7

When Abelin learned that Morris had been murdered, he was devastated. Her death became a "horror, living nightmare." He felt guilty for her murder because he had encouraged her to move to Palm Springs.

Morris had received numerous commendations and awards for her contributions to the arts, including recognition as woman of the year by the wife of Los Angeles Mayor Tom Bradley. Morris was an active member of the Lebanese American community, which was outraged by her murder.

### 2. Defense Evidence

Scott was born in Jacksonville, Texas. He had eight living siblings. Narlena Black, his mother, divorced his father soon after his birth. Scott's father lived in California. Scott was close to his stepfather, and the two enjoyed spending time together and playing sports. During his upbringing, Scott's parents loved him and did their best to teach him right from wrong.

Scott was close to his older brother, who was hit by a car and killed when Scott was a high school senior. Scott was not the same after his brother's death. Scott had a good relationship with his younger brother Terry Roberts. They played several sports together and had occasional disagreements but never any fights. Scott was very protective of his siblings. He joined the military, and family members noticed that after separating from service, he started "running with the wrong type of boys" and engaging in "mischief."

Criminal justice consultant Anthony Casas reviewed Scott's prison and incarceration records, and learned that he had been confined in five or six prisons since 1972. Except for an incident during which he used foul language and another in which he used medication that caused him to hear voices, Casas found nothing in Scott's records to indicate that he had any attitude or behavior problems. Casas opined that if Scott were sentenced to life in prison without

8

possibility of parole, he would not be a threat to other inmates or to correctional personnel.

## II. DISCUSSION

### A. Pretrial and Jury Selection Issues

#### 1. *Challenge for Cause*

Scott contends that the trial court erroneously excused Prospective Juror B.C. for cause based on her death penalty views in violation of the Sixth and Fourteenth Amendments to the federal Constitution.

##### a. *Factual and Procedural Background*

At the time of jury selection, B.C. was a 71-year-old retired insurance underwriter. When asked in the written questionnaire about her general feelings about the death penalty, B.C. said, "I would not want to be on a case that would require the death penalty." She attributed her feelings about the death penalty to her religious beliefs and indicated her feelings were not "very strong." B.C. said she did not feel obligated to accept the view of her religious organization concerning the death penalty and that if the views of that organization were in conflict with the law, she would follow the law. When asked if she would "follow the instruction of the Judge that under our law, you may decide to impose the death penalty only if, in your mind, after weighing and balancing all the evidence in the case, you are persuaded that the aggravating factors substantially outweigh the mitigating factors such that death is warranted," she responded "yes."

Question 75 set forth five categories of thought about the death penalty and asked each prospective juror to indicate which group best described his or her views. The five categories were: "Group One [¶] I will always vote for death in every case of murder with special circumstances. I cannot and will not weigh and consider the aggravating and mitigating factors"; "Group Two [¶] I favor the death

9

penalty but will not always vote for death in every case of murder with special circumstances. I can and will weigh and consider the aggravating and mitigating factors"; "Group Three [¶] I neither favor nor oppose the death penalty"; "Group Four [¶] I have doubts about the death penalty, but I would not vote against it in every case"; and "Group Five [¶] I oppose the death penalty. I will never vote for the death of another person." B.C. placed herself in group four. Question 61 asked, "If a defendant was found guilty of first-degree murder and the special circumstance that 'the murder was committed during the commission of a felony' was found to be true, would you always vote for Life Without Parole, and reject Death, regardless of the evidence presented at the penalty trial?" B.C. responded "yes."

During voir dire on the death qualification issues, B.C. said that in the penalty phase, she could consider the evidence presented and weigh the mitigating and aggravating factors in determining the appropriate penalty. The court asked B.C. whether would she vote for death if she felt the appropriate decision was death, and whether she would vote for life if she felt the appropriate decision was life. B.C. answered "Yes" and said she would make an individualized decision.

Defense counsel questioned the prospective jurors, but he did not specifically question B.C. During voir dire by the prosecutor, B.C. said her feeling that she would not want to serve on a death penalty case was not so strong that she would not be able to follow the law. B.C. confirmed that she would weigh aggravating and mitigating factors. When asked whether she would keep an open mind as to penalty, she answered, "Well, I could — I would probably be more toward the other way." The prosecutor then asked, "Toward life or death?" B.C. replied, "Life, yes. But I'm not saying that I am set."

The prosecutor then questioned B.C. about her response to question 61, that she would always vote for life if a defendant was found guilty of first degree

10

felony murder, regardless of the evidence presented at the penalty trial. B.C. explained, "Well, I prefer life without." B.C. said that if this case proceeded to a penalty phase, she would consider all of the evidence and weigh the aggravating and mitigating factors. The prosecutor then asked B.C. whether, if the jury in this case reached a verdict of death and the trial court polled the jurors as to their personal verdict, she could say, "Yes, my verdict is death." B.C. answered, "I don't know if I could," "I really don't," and "I'm not sure that I could do that part." The prosecutor then asked all prospective jurors undergoing voir dire at the same time as B.C., "Is there anybody among the group who could not come into this courtroom, face [defendant] and return a verdict of death?" B.C. responded, "I'm not sure."

After several prospective jurors were excused by stipulation, the prosecutor challenged B.C. for cause. Defense counsel objected and said, "Well, Your Honor, I think she was close. . . . I think she was close, but she never said that she could not listen and make a decision. As a matter of fact, she said that she would be willing to listen, though it would be extremely difficult for her and hard. But she said she could sit and listen and make a decision as to death, even though she would be leaning towards life without the possibility of parole. . . . At one point she was kind of wavering back and forth, and it might be very difficult for her, but I don't think there's a challenge for cause there based on what I heard."

The trial court granted the challenge, explaining as follows: "She is one of these jurors that — it is my understanding in looking at these cases that there are those jurors who — for example, if you asked them whether or not Adolph Hitler — assuming he was the defendant in this case — whether he would deserve the death penalty, they would say, 'Yes.' Then you ask them — and you bring them back to the real world, . . . what they're really saying is that although they could conceive in an abstract sense of voting for the death penalty, that when you apply

11

to — apply it to the real world, that what they're saying is that they could not. [¶] In listening to her testimony, and although this is certainly a close call, . . . it seems to me that reading between the lines and watching her, her body language, and the way she answered, her reluctance to look up, that what she's really saying is she couldn't vote for the death penalty in the real world. [¶] . . . I'm going to sustain the challenge. . . . [¶] And so I'm going to — I must admit to you that it is an extremely close call, but it seems to me that what she was signaling to us is that really she couldn't vote for the death penalty in the real world if the — if the factors were established by the People pursuant to law."

### b. Discussion

A trial court may excuse a prospective juror for cause upon determining that the juror is " 'substantially impaired in his or her ability to impose the death penalty under the state-law framework.' " (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1328; see *Wainwright v. Witt* (1985) 469 U.S. 412, 424.) "A trial court's determination concerning juror bias is reviewed for abuse of discretion. [Citation.] '[A]ppellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor) gleans valuable information that simply does not appear on the record.' " (*People v. Jones* (2012) 54 Cal.4th 1, 41 (*Jones*); see *Uttecht v. Brown* (2007) 551 U.S. 1, 9 ["Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."].)

As an initial matter, Scott claims that the trial court's examination of B.C. was inadequate to determine whether her death penalty views would substantially

12

impair her ability to serve as a capital juror.  But because Scott did not object or otherwise indicate that the court should have conducted additional voir dire of B.C., he has forfeited this claim.  (*People v. Foster* (2010) 50 Cal.4th 1301, 1324.)

At any rate, substantial evidence supports the trial court's determination that B.C.'s death penalty views disqualified her from serving as a capital juror.  In her questionnaire, B.C. said that she would follow the law instead of her religious views and that she would consider the evidence and weigh the aggravating and mitigating circumstances in accordance with the judge's instructions.  But B.C. also indicated that if a jury convicted a defendant of first degree felony murder, she would always vote for life, regardless of the evidence presented at the penalty trial.  B.C. gave similarly conflicting responses during voir dire.  She indicated a willingness to remain open on the question of penalty, follow the trial court's instructions, and weigh and consider all of the evidence.  But she also said she was unsure she could state in open court that she voted for death if the jury in this case decided death was the appropriate penalty.

Faced with these conflicting responses, the trial court acknowledged that "it is an extremely close call" but explained that "reading between the lines and watching her, her body language, and the way she answered, her reluctance to look up, what she's really saying is she couldn't vote for the death penalty in the real world."  By stating its observations of B.C.'s demeanor, the trial court made clear that it had " 'glean[ed] valuable information that simply does not appear on the record.' "  (*Jones*, *supra*, 54 Cal.4th at p. 41.)  The trial court's observations of B.C.'s demeanor, along with B.C.'s written and verbal answers, comprise substantial evidence supporting the conclusion that B.C.'s personal views would substantially impair her ability to serve as a capital juror.  We defer to the trial court's determination and find no abuse of discretion.

13

*2.* Batson/Wheeler *Motion*

Scott, who is African American, contends that the prosecutor violated his state and federal constitutional rights to equal protection and a jury drawn from a fair cross-section of the community by peremptorily excusing two African American prospective jurors. (See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).) The claim lacks merit.

*a. Factual and Procedural Background*

The 87 prospective jurors qualified to serve on Scott's jury identified themselves in their juror questionnaires as follows: four as African American, 14 as Latino, one as African American and Latino, 59 as white, and nine either did not indicate any racial or ethnic group or indicated some other group. The prosecutor exercised his seventh peremptory challenge to excuse R.C. and exercised his tenth challenge to excuse H.R. Both are African American.

*Prospective Juror R.C.*

R.C. stated in her questionnaire that she was not personally acquainted but had "been in court" with the deputy district attorney assigned to this case when he prosecuted her son. According to the questionnaire, R.C. visited her son in prison "as much as possible," claimed that her son had had "unpleasant experiences" with law enforcement and this district attorney's office in particular, and believed that her son was not treated fairly by those agencies.

Prior to voir dire, the defense stipulated to R.C.'s excusal because the assigned deputy district attorney had indeed prosecuted the prospective juror's son. At the time of her son's trial, R.C. had claimed to the media "that the prosecution was unwarranted and racially motivated." The trial court did not accept the stipulation, however, and said it felt obliged to make an inquiry into the prospective juror's ability to be fair.

14

When asked in voir dire whether there was anything in her life "that would in any way affect [her] ability to be fair to both sides in this case," R.C. reiterated that the assigned deputy district attorney had successfully prosecuted her son and sent him to prison a year or two earlier, that she thought her son was not treated fairly by the district attorney's office in "some parts," and that she did not know whether the district attorney would want someone like her on the jury. Although she admitted having been very upset at the time of her son's trial, she asserted that she had "no hard feelings" about the prior prosecution and that she could be fair in this case — despite the fact the same police department (Palm Springs) and the same lead investigator were involved and "some of the situation is somewhat similar."

*Prospective Juror H.R.*

H.R. stated in his questionnaire that he would consider all the aggravating and mitigating evidence presented before deciding the question of penalty and could vote for death in an appropriate case. However, in response to question 75, which asked jurors to read five options that described views about imposing the death penalty and to "check the one that best describes" their views, H.R. put a checkmark next to group five, which stated, "I oppose the death penalty. I will never vote for the death of another person." Despite the instructions, H.R. *also* put a checkmark next to group four, which stated, "I have doubts about the death penalty, but I would not vote against it in every case," *and* next to group three, which stated, "I neither favor nor oppose the death penalty."

The trial court began voir dire by advising H.R. that membership in group five meant that "not only do you oppose the death penalty," but "you [could] never vote for the death penalty regardless of the evidence." When the trial court subsequently asked H.R. whether he could consider the aggravating and mitigating

15

circumstances in a penalty trial and vote for either penalty, H.R. said, "Sure" and "Yes." H.R. also said that if the jury in this case were to return a death verdict, he could face Scott and affirm that this was his verdict. But when asked by the court to clarify which of the three groups he checked off in question 75 best represented his views about imposing the death penalty, H.R. hesitated and said he wanted to "think about it." After the court reiterated that "[y]ou understand if you are in group five, you cannot serve; do you understand that?," H.R. finally replied, "I think group four would be more the way I feel."

Under questioning by the prosecutor, H.R. claimed he had misread question 75 and that when he looked at it again, he said he had made a mistake. He added that he was still leaning "more toward group 4 than any other groups." When asked if he could ever imagine a crime or a defendant so terrible as to warrant the death penalty, H.R. replied, "In a sense I guess that's possible. . . . I guess I could" and "I think I can."

*The Motion to Dismiss the Panel*

After the jurors were sworn but before the alternate jurors were selected, Scott moved to dismiss the panel, asserting that the prosecutor's decisions to strike R.C. and H.R. were racially motivated. Defense counsel relied in particular on R.C.'s statements that she could put aside the "situation" with her son and decide the case solely on the evidence, and on H.R.'s statements that he could be a fair and impartial juror and would be able to vote for death in an appropriate case.

The trial court ruled that Scott's motion appeared to be untimely and therefore forfeited because he had not objected to the strikes until after the jurors had been sworn, but nonetheless went on to address the merits. As to R.C., the court acknowledged that she had said "all the right things" but doubted that "any prosecutor" would have kept her on the jury: "I think that was — that was so

16

obvious a point that I don't think anyone could." The court concluded that "no prima facie case could be made" as to R.C.

Turning to H.R., the trial court said it "suspect[ed] there may well be a neutral race explanation," but added, "I believe that it could be argued that a — that a prima facie case could be made. You feel that you want to respond, or do you want to rest on the Court's ruling on the waiver? I'll leave that to you, sir." The trial court also asked whether the prosecutor wanted "to say anything more about Miss [C.]" The prosecutor replied, "Well, I don't want to say anything until I'm required to by the Court," and inquired whether the court had already ruled there was no prima facie showing of discrimination as to these jurors. The court then clarified its position: "What I said was that in the case of Miss [C.], it was so obviously there was no basis for [the *Batson*/*Wheeler* motion] that I want the record to be abundantly clear on that point. I mean that — that was just completely obvious." With respect to H.R., the court explained, "I — my sense is based upon his — his answers in the questionnaire to suggest that there are — that there would probably be a legitimate basis. He had substantial reluctance to the death penalty in his questionnaire. He placed himself at one point in category 5 as I recall although he ultimately said he was in category 4, but I don't want to get into that exercise. [¶] . . . [¶] MR. BEST: Okay. And if you are saying that you have not found a prima facie case, then I will state my reasons as to Mr. [R.] for the record. But I am not agreeing that there has been a prima facie showing. But I will say it out of an abundance of caution to preserve the record, but I am not agreeing, and I want it clear whether or not the Court has made the ruling that there is a prima facie case. [¶] THE COURT: . . . [B]efore the Court were to — to find that — [¶] MR. BEST: There are cases where the court has declined to find a prima facie case and then has solicited the prosecutor's reasons anyway. If that's the situation we are in and the record clearly reflects that, then I will provide

17

my reasons for the record.  [¶] THE COURT:  That would be my position.  [¶] MR. BEST:  Then I will accept that and do that.  As to both jurors or?  [¶]  THE COURT:  No.  I mean — if anyone . . . who reads this transcript thinks that Miss [C.] would be a fair juror to the People, then I would — then I give up making decisions.”

Accepting the invitation to discuss his reasons as to H.R., the prosecutor explained that “the reasons for excusing him were what I considered inconsistent answers on the death penalty.  On the initial questionnaire, he marked groups 3, 4 and 5.  Five being the group that would never under any circumstances vote for the death penalty.  [¶]  Even under questioning, all he would indicate is he is leaning toward group 4 which is the group that does not favor the death penalty but would not rule it out.  Based on that, I did not believe I knew where he stood on the death penalty; and based on that, I excused him.”

The trial court denied the defense motion, saying, “In looking at [*People v. Medina* (1995) 11 Cal.4th 694], I read that case, gives some guidance on this point and the Supreme Court confirmed in that case that an exercise of the challenge based upon a reluctance to impose the death penalty is an appropriate basis for the exercise of the challenge.  It would seem to me that — I accept that.  Those were basically the reasons that I mentioned to you —  [¶] . . .  [¶] — before we began.”

### b. Discussion

Both the state and federal Constitutions prohibit the use of peremptory strikes to remove prospective jurors on the basis of group bias.  (*Batson*, *supra*, 476 U.S. at p. 89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276–277.)  The now familiar *Batson*/*Wheeler* inquiry consists of three distinct steps.  First, the opponent of the strike must make out a prima face case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of

18

peremptory challenges.  Second, if the prima facie case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications.  Third, if the party has offered a nondiscriminatory reason, the trial court must decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination.  (*Johnson v. California* (2005) 545 U.S. 162, 168 (*Johnson*).)

At the outset, we find erroneous the trial court's ruling that Scott's *Batson*/*Wheeler* motion was untimely.  The trial court determined that Scott's motion was untimely because he did not object to the prosecutor's challenges to R.C. and H.R. until after the 12 jurors were sworn.  A *Batson*/*Wheeler* motion is timely if it is made before jury impanelment is completed, which does not occur " 'until the *alternates* are selected and sworn.' "  (*People v. McDermott* (2002) 28 Cal.4th 946, 970, italics added.)  As we explained in *McDermott*, "discriminatory motive may become sufficiently apparent to establish a prima facie case only during the selection of alternate jurors, and a motion promptly made before the alternates are sworn, and before any remaining unselected prospective jurors are dismissed, is timely not only as to the prospective jurors challenged during the selection of the alternate jurors but also as to those dismissed during selection of the 12 jurors already sworn."  (*Id.* at p. 969.)  Because Scott objected before the alternate jurors were selected and sworn, his *Batson*/*Wheeler* motion was timely.  We therefore turn to the merits of Scott's motion.

A prima facie case of racial discrimination in the use of peremptory challenges is established if the totality of the relevant facts " 'gives rise to an inference of discriminatory purpose.' "  (*Johnson*, *supra*, 545 U.S. at p. 168.)  In this case, the trial court ruled that Scott had not raised an inference of discrimination as to either prospective juror.  We review that ruling independently where, as here, the trial predated *Johnson* and it is not clear from the record

19

whether the trial court analyzed the *Batson*/*Wheeler* motion with this low threshold in mind.  (*People v. Thomas* (2012) 53 Cal.4th 771, 794.)

Although the question at the first stage concerning the existence of a prima facie case depends on consideration of the entire record of voir dire as of the time the motion was made (*People v. Lenix* (2008) 44 Cal.4th 602, 624), we have observed that certain types of evidence may prove particularly relevant.  (*People v. Bonilla* (2007) 41 Cal.4th 313, 342 (*Bonilla*).)  Among these are that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of the remaining jurors belong.  (*Wheeler*, *supra*, 22 Cal.3d at pp. 280–281.)  A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and "clearly established" in the record (*People v. Box* (2000) 23 Cal.4th 1153, 1189; see *People v. Turner* (1994) 8 Cal.4th 137, 168) and that necessarily dispel any inference of bias.  (*People v. Taylor* (2010) 48 Cal.4th 574, 644; accord, *United States v. Stephens* (7th Cir. 2005) 421 F.3d 503, 516, 518 ["the examination of 'apparent' reasons in the record . . . involves only reasons for the challenges that are objectively evident in the record" such that "there is no longer any suspicion, or inference, of discrimination in those strikes"]; cf. *Williams v. Runnels* (9th Cir. 2006) 432 F.3d 1102, 1110 ["refutation of the inference requires more than a determination that the record could have supported race-neutral reasons for the prosecutor's use of his peremptory challenges"].)

Scott points out that the prosecutor struck two of the three African Americans and three of an unknown number of Latinos who made it into the jury box, that he is African American, and that the victim was white.  He urges us to

find a prima facie case of discrimination on those facts alone.  Although those facts may be probative on the issue of discriminatory intent (*Bonilla*, *supra*, 41 Cal.4th at p. 342), the high court has directed us to consider the *totality* of the relevant facts in determining whether an inference of discrimination exists. (*Johnson*, *supra*, 545 U.S. at p. 168.)  Viewed as a whole, the record in this case clearly establishes nondiscriminatory reasons for excusing R.C. and H.R. that dispel any inference of bias.

R.C. was familiar with the deputy district attorney because he had successfully prosecuted R.C.'s son a year or two earlier and had committed her son to prison — with the assistance of the same lead investigator who would be testifying in the current prosecution.  Moreover, R.C. had criticized her son's prosecution as racially motivated, and she admitted having been very upset about it.  Like the trial court, we doubt that any prosecutor would have kept R.C. on the jury, despite her assertion that she could be fair and impartial in this case.  No inference of purposeful discrimination arose from this strike.  (*People v. Lancaster* (2007) 41 Cal.4th 50, 77–78.)

The record also established compelling reasons to excuse H.R., who in his questionnaire said he was so opposed to the death penalty as to be unwilling to impose it under any circumstances.  Although H.R. elsewhere said in his questionnaire that while he was opposed to the death penalty, he would be able to impose it in some circumstances (and that he neither favored nor opposed the death penalty) — and claimed in voir dire that the confusing responses were a "mistake" — he nonetheless struggled in voir dire to explain which category best accorded with his own views, even after being told *twice* that a complete unwillingness to impose the death penalty would render him ineligible for jury service.  Even if the conflicting questionnaire responses and the voir dire on the subject would not have justified a for-cause challenge, a prosecutor would

21

reasonably want to avoid the risk that H.R. actually would, as he stated in the questionnaire, "never vote for the death of another person." (See *People v. Sattiewhite* (2014) 59 Cal.4th 446, 470; *People v. Panah* (2005) 35 Cal.4th 395, 441.) This risk was sufficient to dispel an inference of discrimination.

### c. *Clarification of Our Practice in Reviewing* Batson/Wheeler *Motions*

In this case, the trial court determined first that Scott had failed to raise an inference of discrimination in connection with the strikes of R.C. and H.R. It then granted the prosecutor an opportunity to state his reasons for excusing those jurors. After being assured that the trial court had found no prima facie case of discrimination, the prosecutor made a record of his reasons for excusing H.R. The prosecutor did not offer reasons for excusing R.C., presumably because of the trial court's statement that the reasons for excusing her were so obvious that it would "give up making decisions" if anyone thought she could have been a fair juror. The trial court, as an alternative holding, then credited the prosecutor's reasons and determined that the strike of H.R. did not constitute purposeful discrimination.

The United States Supreme Court has not established whether an appellate court in such circumstances should review the trial court's first-stage ruling that there was no prima facie case of discrimination or, instead, its third-stage ruling that there was no purposeful discrimination. Appellate tribunals therefore have some flexibility in fashioning a workable procedure, so long as the approach complies with the familiar three-step *Batson*/*Wheeler* framework. (*People v. Mata* (2013) 57 Cal.4th 178, 183; see *Johnson*, *supra*, 545 U.S. at p. 168 ["States do have flexibility in formulating appropriate procedures to comply with *Batson*"]; *Batson*, *supra*, 476 U.S. at p. 99 ["We decline . . . to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's

22

challenge"]; accord, *State v. Jacobs* (La. 2001) 803 So.2d 933, 940; *People v. Hameed* (N.Y. 1996) 666 N.E.2d 1339, 1341.)

Neither the parties nor Justice Liu disputes that an appellate court properly reviews the first-stage ruling if the trial court has determined that no prima facie case of discrimination exists, then allows or invites the prosecutor to state reasons for excusing the juror, but refrains from ruling on the validity of those reasons. (E.g., *People v. Taylor*, *supra*, 48 Cal.4th at pp. 612-614; *People v. Hawthorne* (2009) 46 Cal.4th 67, 78–79 & fn. 2; accord, *United States v. Johnson* (7th Cir. 2014) 756 F.3d 532, 536–537; see *United States v. Valencia-Trujillo* (11th Cir. 2009) 573 F.3d 1171, 1184, fn. 8.) What divides them is whether the same procedure applies when the trial court, having determined that no prima facie case was established and having heard the proffered justifications, goes ahead and makes an alternative holding that those reasons were genuine.

We recognize that our jurisprudence on this issue has not always been entirely consistent. (Compare, e.g., *People v. Banks* (2014) 59 Cal.4th 1113, 1146 [in " 'such a circumstance,' " " ' "we express no opinion on whether defense counsel established a prima facie case of discrimination and instead skip to *Batson*'s third stage to evaluate the prosecutor's reasons" ' "] with *People v. Lopez* (2013) 56 Cal.4th 1028, 1049–1050 [where trial courts choose " 'to request and consider a prosecutor's stated reasons for excusing a prospective juror even when they find no prima facie case of discrimination,' " the request does " ' "not convert

[this] first-stage *Wheeler*/*Batson* case into a third-stage case" ' "].) We therefore take this opportunity to clarify our practice.[1]

In formulating an approach to the question before us, we must be mindful of the interests at stake. The *Batson*/*Wheeler* framework is designed to enforce the constitutional prohibition on exclusion of persons from jury service on account of their membership in a cognizable group. It is also designed to otherwise preserve the historical privilege of peremptory challenges free of judicial control, which "traditionally have been viewed as one means of assuring the selection of a qualified and unbiased jury." (*Batson*, *supra*, 476 U.S. at p. 91.) A balancing of these competing interests explains why the party exercising a peremptory challenge has the burden to come forward with nondiscriminatory reasons *only* when the moving party has first made out a prima facie case of discrimination. (*J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127, 145; accord, *Brown v. Dixon* (4th Cir. 1989) 891 F.2d 490, 497.) Although mandating further inquiry, even when the opponent of the strike was unable to raise an inference of discrimination

---

[1] We distinguish at the outset the situation here, where the trial court made independent rulings that no prima facie case existed *and* that no purposeful discrimination occurred, from the situation where a trial court skips over the first stage altogether (e.g., *Hernandez v. New York* (1991) 500 U.S. 352, 359 (*Hernandez*) (plur. opn. of Kennedy, J.); *People v. Elliott* (2012) 53 Cal.4th 535, 560) or purported to rule on the first stage only after the prosecutor had already offered a statement of reasons (e.g., *People v. Chism* (2014) 58 Cal.4th 1266, 1311–1312; *People v. Mills* (2010) 48 Cal.4th 158, 173–174). When a trial court solicits an explanation of the strike without first declaring its views on the first stage, we infer an "implied prima facie finding" of discrimination and proceed directly to review of the ultimate question of purposeful discrimination. (*People v. Arias* (1996) 13 Cal.4th 92, 135 ["The court cannot undo an implied ruling once made by stating after explanations have been received that it never intended to find a prima facie case"].)

24

from the existing record, might either help confirm the trial court's first-stage ruling or refute it, we must harmonize the constitutional interest in combating discrimination with the United States Supreme Court's preservation of the peremptory challenge in *Batson*. (See *Rice v. Collins* (2006) 546 U.S. 333, 343 (conc. opn. of Breyer, J.).)

Our approach to *Batson*/*Wheeler* motions has also been shaped by practical considerations. Even though a peremptory challenge is designed to be used "for any reason, or no reason at all" (*Hernandez*, *supra*, 500 U.S. at p. 374 (conc. opn. of O'Connor, J.)) — and a party exercising a strike thus has no obligation to articulate a reason until an inference of discrimination has been raised (*People v. Williams* (1997) 16 Cal.4th 635, 663–664) — we have nonetheless repeatedly encouraged trial courts to offer prosecutors the opportunity to state their reasons so as to enable creation of an adequate record for an appellate court, should it disagree with the first-stage ruling, to determine whether any constitutional violation has been established. (*People v. Howard* (2008) 42 Cal.4th 1000, 1020; *Bonilla*, *supra*, 41 Cal.4th at p. 343, fn. 13; accord, *United States v. Collins* (9th Cir. 2009) 551 F.3d 914, 927–928 (conc. opn. of Graber, J.) ["Judicial economy would be well served," as "would confidence in the fairness of a trial"]; *State v. Holloway* (Conn. 1989) 553 A.2d 166, 172; *Robinson v. United States* (D.C. 2006) 890 A.2d 674, 683 ["such voluntary proffers should be encouraged"]; *State v. Sledd* (Kan. 1992) 825 P.2d 114, 119; *Brawner v. State* (Miss. 2004) 872 So.2d 1, 10–11 [such a practice "would allay the difficulties caused by lost or misplaced documentation and faded memories," and, if the reviewing court determines a prima facie case was made, "this procedure gives the Court a complete record for reviewing the issue of pretext"].) After all, when a trial court erroneously fails to discern an inference of discrimination and terminates the inquiry at that point, an appellate court is generally required to order a remand to allow the parties and the

25

trial court to continue the three-step *Batson*/*Wheeler* inquiry.  (See, e.g., *People v. Johnson* (2006) 38 Cal.4th 1096, 1103–1104.)  An investigation into the prosecutor's motives many years after the fact, when memories have faded and the parties' written notes can no longer be found, is an inferior substitute for a contemporaneous record of the prosecutor's justification and the defendant's response.

Yet prosecutors may be reluctant to state their reasons for the record if doing so would jeopardize or nullify a ruling in their favor that the defense failed to raise an inference of discrimination.  (*Robinson v. United States*, *supra*, 890 A.2d 674 at p. 683 ["to treat the prosecution's proffer as a waiver by the government of the trial court's ruling in its favor" would "deter prosecutors from making such proffers"].)  Indeed, this case provides solid proof that *Robinson*'s concerns were not mere speculation.  The prosecutor here declared unequivocally, "I don't want to say anything until I'm required to by the Court" and continued to resist offering any statement of reasons until he was satisfied the record "clearly reflect[ed]" the trial court's finding that Scott had failed to present a prima facie case of discrimination.  (See *People v. Howard*, *supra*, 42 Cal.4th at p. 1020 ["emphasiz[ing]" that when a trial court has concluded "that a prima facie showing has not been made, the request" for a statement of reasons "does not convert a first-stage *Wheeler*/*Batson* case into a third-stage case"].)

Our appellate procedure, then, should seek to advance several objectives. We must ensure that the discriminatory use of peremptory challenges is discovered and remedied, that the right to unexplained peremptory challenges is otherwise preserved, *and* that the parties are not discouraged from creating a record that is sufficient for resolution of the *Batson*/*Wheeler* claim on appeal.  Our rule should also be clear, predictable, and easy to apply.  We therefore consider

closely the operation of the approaches proposed by the Attorney General and by Scott and Justice Liu.

If (as Scott and Justice Liu propose) an appellate court should proceed directly to the third stage whenever the trial court has determined *both* that no prima facie case of discrimination existed *and* that no purposeful discrimination occurred, then the trial court may be discouraged from ever making the threshold determination whether a prima facie case exists. (See Serr & Maney, *Racism, Peremptory Challenges, and the Democratic Jury: The Jurisprudence of a Delicate Balance* (1988) 79 J. Crim. L. & Criminology 1, 41.) Even when the trial court addresses the first-stage inquiry, prosecutors will not want to jeopardize the favorable ruling by placing their reasons on the record. (*Robinson v. United States*, *supra*, 890 A.2d at p. 683.) A remand will thus be needed to create that record, years after the trial, whenever an appellate court disagrees with the trial court's first-stage ruling. And even when the prosecutor has offered reasons, Scott's rule will prove uncertain of application where, as here, the parties disagree as to whether the trial court actually made a ruling on the ultimate issue of purposeful discrimination. (Cf. *People v. Taylor*, *supra*, 48 Cal.4th at pp. 613–614.)

By contrast, if (as the Attorney General proposes) an appellate court can review the first-stage ruling when, as here, the trial court has made alternative rulings at both the first and third stages, then the trial court has no incentive to skip over the first-stage inquiry. Likewise, the prosecutor has no incentive to withhold his or her reasons for the peremptory challenge. In addition, the Attorney General's rule is simple and predictable: when the trial court finds there is no prima facie case of discrimination before the proponent of the strike has been asked for or has volunteered a statement of reasons, then the appellate court should begin its review with the first-stage ruling.

27

The approaches proposed by Scott and the Attorney General each rely on the same three-step *Batson*/*Wheeler* framework and thus each is equally sensitive to the possibility of discrimination. Scott, however, contends the approaches do not equally remedy unlawful discrimination and posits a scenario in which a trial court correctly finds no prima facie case of discrimination, the prosecutor then offers a discriminatory reason, but the trial court nonetheless rejects the defendant's *Batson*/*Wheeler* objection. He contends that an appellate court's focus on the first-stage ruling would "insulate" the discriminatory reason from scrutiny in that instance.

But the prospect that a strike motivated by unlawful bias could evade full review arises any time a trial court terminates the *Batson*/*Wheeler* inquiry at the first stage, and is a legacy of the *Batson* framework itself. This troubling scenario could also arise whenever the prosecutor chooses not to place his or her justifications for the strike on the record — a result that the approach endorsed by Scott and Justice Liu would actively encourage. Even when — as Justice Liu hypothesizes — comparative analysis could demonstrate that the prosecutor's stated reasons may have been pretextual, the prosecutor's reasons would nonetheless be insulated from appellate review as long as the trial court had not *ruled* on the sincerity of the proffered reasons. Indeed, under the approach proposed by Scott, a facially discriminatory reason that is placed on the record would be insulated from review as long as the trial court refrained from actually deciding the ultimate issue of discrimination. Scott's hypothetical scenario, therefore, does not afford a basis for choosing one approach over the other. We should, however, consider more closely the role a prosecutor's discriminatory reason may play in an appellate court's review of a finding that no prima facie case existed.

28

As the parties have acknowledged, a reviewing court may not rely on a prosecutor's statement of reasons to *support* a trial court's finding that the defendant failed to make out a prima facie case of discrimination. Although a court reviewing a first-stage ruling that no inference of discrimination exists "may consider apparent reasons for the challenges discernible on the record" as part of its "consideration of 'all relevant circumstances' " (*United States v. Stephens*, *supra*, 421 F.3d at pp. 515–516), the fact that the prosecutor volunteered one or more nondiscriminatory reasons for excusing the juror is of no relevance at the first stage. Because an inference of discrimination rises or falls based on the circumstances in the record, "[t]o say 'the prosecutor gave a reason, therefore there is no prima facie case' is to scramble the analysis in a way that potentially eliminates the need to evaluate the prosecutor's honesty." (*Hooper v. Ryan* (7th Cir. 2013) 729 F.3d 782, 787; see *Johnson*, *supra*, 545 U.S. at p. 171 [" 'It is not until the *third* step that the persuasiveness of the justification becomes relevant' "].)[2]

The legal calculus is different when the reason offered by the prosecutor is not used by the reviewing court to defeat a prima facie case, but to bolster it. Both *Batson* and *Wheeler* emphasized that the purposeful exclusion of identifiable groups from participation on juries undermines public respect for our criminal justice system. (*Batson*, *supra*, 476 U.S. at p. 99; *Wheeler*, *supra*, 22 Cal.3d at p. 270.) When discriminatory intent is " 'inherent' " in the explanation offered by the prosecutor (*Purkett v. Elem* (1995) 514 U.S. 765, 768), the public's confidence

---

[2] To the extent that *People v. Mayfield* (1997) 14 Cal.4th 668, 723–724, suggested otherwise, it should no longer be followed.

in the rule of law suffers, regardless of whether the defendant was able to make out a prima facie case of discrimination.  In these circumstances, "justice must satisfy the appearance of justice."  (*Offutt v. United States* (1954) 348 U.S. 11, 14.) Reviewing courts, therefore, should not blind themselves to the record in the "rare" circumstance that a prosecutor volunteers a justification that is discriminatory on its face.  (*Kesser v. Cambra* (9th Cir. 2006) 465 F.3d 351, 373 (conc. opn. of Wardlaw, J.).)  A proffered justification that is facially discriminatory must be weighed with the totality of the relevant facts to determine whether they give rise to an inference of discriminatory purpose and thus compel analysis of the subsequent steps in the *Batson*/*Wheeler* framework.

In sum, where (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror for the record, (3) the prosecutor provides nondiscriminatory reasons, and (4) the trial court determines that the prosecutor's nondiscriminatory reasons are genuine, an appellate court should begin its analysis of the trial court's denial of the *Batson*/*Wheeler* motion with a review of the first-stage ruling.  (*People v. Lopez*, *supra*, 56 Cal.4th at pp. 1047–1050; *People v. Clark* (2011) 52 Cal.4th 856, 904-908; *People v. Howard*, *supra*, 42 Cal.4th at pp. 1017–1019; *People v. Guerra* (2006) 37 Cal.4th 1067, 1101–1103 (*Guerra*); *People v. Boyette* (2002) 29 Cal.4th 381, 421–423; *People v. Farnam* (2002) 28 Cal.4th 107, 135-139; *People v. Mayfield*, *supra*, 14 Cal.4th at pp. 722–723; *People v. Turner*, *supra*, 8 Cal.4th at pp. 165–171; accord, *United States v. Ervin* (6th Cir. 2008) 266 Fed.Appx. 428, 432–433; *Sorto v. Herbert* (2d Cir. 2007) 497 F.3d 163, 175, fn. 9; *State v. Sledd*, *supra*, 825 P.2d at p. 119 ["it is the better practice to have the State respond, and then for the court to make a determination on whether the reasons are racially neutral," which "would eliminate remands for such a determination if the trial court is held to have erred in holding the defendant

30

had failed to make the prima facie showing"]; *State v. Joe* (La.Ct.App. 1996) 678 So.2d 586, 591 ["this is undoubtedly the better practice"]; *Brawner v. State*, *supra*, 872 So.2d at pp. 9–11; *People v. Bruton* (N.Y.App.Div. 2002) 735 N.Y.S.2d 759.)[3] If the appellate court agrees with the trial court's first-stage ruling, the claim is resolved. If the appellate court disagrees, it can proceed directly to review of the third-stage ruling, aided by a full record of reasons and the trial court's evaluation of their plausibility.

In the circumstance where (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror on the record, (3) the prosecutor provides a reason that is discriminatory on its face, and (4) the trial court nonetheless finds no purposeful discrimination, the appellate court should likewise begin its analysis of the trial court's denial of the *Batson*/*Wheeler* motion with a review of the first-stage ruling. In that (likely rare) situation, though, the relevant circumstances, including the facially discriminatory justification advanced by the prosecutor, would almost certainly raise an inference of discrimination and therefore trigger review of the next step of the *Batson*/*Wheeler* analysis.

Our case law recognizes an additional wrinkle when the appeal involves multiple *Batson*/*Wheeler* challenges. Where the appellate court is already evaluating the sincerity of the proffered reason for excusing one juror as part of its review of all the evidence as it bears on the question whether the excusal of

---

**3** To this limited extent, *People v. Banks* (2014) 59 Cal.4th 1113, 1146, and *People v. McKinzie* (2012) 54 Cal.4th 1302, 1320, should no longer be followed.

*another* juror constituted unlawful discrimination (see *Miller-El v. Dretke* (2005) 545 U.S. 231, 252; *People v. Lenix*, *supra*, 44 Cal.4th at p. 616), the appellate court may likewise begin its review of the denial of the *Batson/Wheeler* motion as to the first juror by evaluating the sincerity of the proffered reason. In *People v. Riccardi* (2012) 54 Cal.4th 758, for example, the trial court denied the defendant's first, second, and fourth *Batson/Wheeler* motions after hearing the prosecutor's reasons and without making any express findings as to the existence of a prima facie showing of discrimination. (*Riccardi*, at pp. 784–786.) Review of those rulings necessarily began with the third stage. (See *People v. Jurado* (2006) 38 Cal.4th 72, 104 ["By asking the prosecutor to explain the peremptory challenges, the trial court here implicitly found that defendant had made a prima facie showing"].) Only as to the third motion did the trial court deny it without first hearing from the prosecutor, although the prosecutor did eventually supply a reason for excusing that juror in connection with the last *Batson/Wheeler* motion (and the trial court "appeared implicitly to agree with the prosecutor's reasons"). (*Riccardi*, *supra*, at p. 786.) Because our assessment of the lawfulness of the strikes exercised against the first, second, and fourth jurors included an evaluation of the legitimacy of the prosecutor's reason for striking the third juror — and because it would have been wholly artificial to consider those reasons as to the first, second, and fourth jurors but not as to the third juror herself — we elected in those particular circumstances to review the trial court's third-stage ruling as to all four jurors. (*Id.* at pp. 786–787; see *People v. Chism*, *supra*, 58 Cal.4th at pp. 1313–1314; *People v. Montes* (2014) 58 Cal.4th 809, 852–857.)

This case, however, is governed by the general rule. For the reasons set forth in the preceding section, the trial court correctly concluded that Scott failed to make out a prima facie case of discrimination as to either strike. That is sufficient to resolve his claim of *Batson/Wheeler* error.

32

Justice Liu and the cases he cites rely heavily on the plurality opinion in *Hernandez* to conclude that the first-stage inquiry is moot. (Conc. opn., *post*, at pp. 1, 7–9.) We respectfully disagree with their reading of *Hernandez*. *Hernandez* held that the issue of whether the defendant had made a prima facie showing of discrimination was moot only in the particular circumstance where the trial court failed to consider whether a prima facie showing had been made, and ruled instead on the ultimate question of intentional discrimination. (*Hernandez*, *supra*, 500 U.S. at p. 359 (plur. opn. of Kennedy, J.).) Indeed, the prosecution never disputed, in state court or in the high court, that the first stage had been satisfied. (*People v. Hernandez* (N.Y. 1990) 553 N.Y.S.2d 85, 87; *Hernandez*, *supra*, 500 U.S. at p. 378 (dis. opn. of Stevens, J.).) Accordingly, as we have previously explained, *Hernandez* has no application where, as here, the trial court "expressly found that a prima facie case of discrimination was *not* established." (*Guerra*, *supra*, 37 Cal.4th at p. 1103; accord, *State v. Allen* (La. 2005) 913 So.2d 788, 802 ["the defendant's reliance upon the rule set forth . . . in *Hernandez* is misplaced," since "it is obvious from the district court's ruling that the defense's *Batson* challenge had already failed when the State proffered its reasons for appeal purposes only"]; *Brawner v. State*, *supra*, 872 So.2d at p. 10, fn. 1 [distinguishing *Hernandez* on the ground that "the State offered neutral reasons without the trial judge first finding that a prima facie case has been made"]; *State v. Williams* (N.C. 1996) 471 S.E.2d 379, 386–387 [explaining that *Hernandez* "does not apply in this case because the trial court made a ruling that defendant failed to make a prima facie showing before the prosecutor articulated his reasons for the peremptory challenges"].)

Justice Liu also posits that our analysis "cannot be reconciled with the *Batson* framework" (conc. opn., *post*, at p. 2), which (as the high court has explained) "is designed to produce actual answers to suspicions and inferences

33

that discrimination may have infected the jury selection process." (*Johnson*, *supra*, 545 U.S. at p. 172.) But "suspicions" and "inferences" of discrimination are precisely what appear to be missing when, as here, a trial court permissibly finds that the moving party has failed to satisfy the first stage of the *Batson* framework but nonetheless allows the other party to place its reasons on the record. (Cf. *Johnson v. Love* (3d Cir. 1994) 40 F.3d 658, 665-667 [finding the trial court erred in ruling that no prima facie case existed].) Notably, Justice Liu does not claim that the record here supported any inference or suspicion of discrimination. Nothing in *Batson* required the trial court or an appellate court to supply actual answers to a question that did not arise.

Justice Liu cites a handful of cases that have taken an approach similar to the one he espouses. These cases reflect a diversity of practice among state and federal appellate courts — and often within a state — where, as here, the trial court has determined that no prima facie case of discrimination exists, the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror for the record, the prosecutor provides nondiscriminatory reasons, and the trial court determines that the prosecutor's nondiscriminatory reasons are genuine. The flexibility granted by the high court in implementing *Batson*, while limited, appears to tolerate these diverse approaches. Moreover, our approach is consistent with prior precedent and the balance struck by the high court with respect to remedying unlawful discrimination in jury selection within a system that permits peremptory challenges. (*People v. Lopez*, *supra*, 56 Cal.4th at pp. 1047–1050; *People v. Clark*, *supra*, 52 Cal.4th 856 at pp. 904–908; *People v. Howard*, *supra*, 42 Cal.4th at pp. 1017–1019; *Guerra*, *supra*, 37 Cal.4th at pp. 1101–1103; *People v. Boyette*, *supra*, 29 Cal.4th at pp. 421–423; *People v. Farnam*, *supra*, 28 Cal.4th at pp. 135–139; *People v. Mayfield*, *supra*, 14 Cal.4th at pp. 722–723; *People v. Turner*, *supra*, 8 Cal.4th at pp. 165–171; accord, *United States v. Ervin*, *supra*, 266

34

Fed.Appx. at pp. 432–433; *Sorto v. Herbert*, *supra*, 497 F.3d at p. 175, fn. 9; *State v. Sledd*, *supra*, 825 P.2d at p. 119; *State v. Joe*, *supra*, 678 So.2d at p. 591; *Brawner v. State*, *supra*, 872 So.2d at pp. 9–11; *People v. Bruton*, *supra*, 735 N.Y.S.2d at p. 759.) Because *Hernandez* explicitly found "no error" when the New York appellate courts began *their* analysis with the trial court's first-stage ruling (*Hernandez*, *supra*, 500 U.S. at p. 372 (plur. opn. of Kennedy, J.)), we are confident that our analytical model rests within the discretion granted us by *Batson* and *Johnson*.

### 3. *Severance Motion*

The trial court denied Scott's pretrial motion to sever the homicide charges in counts 1 through 4 from the charges in counts 6 through 9 alleging four nearby burglaries following the murder. Thereafter, Scott pleaded guilty to the four subsequent burglaries. On appeal, Scott claims that the trial court erred in denying his severance motion. In the alternative, he contends that his trial resulted in gross unfairness amounting to a denial of due process.

At the outset, we note that in this and certain other appellate claims, Scott contends that the asserted error violated his constitutional rights to due process, a fair trial, and reliable verdicts under the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution. Because the trial court granted defense counsel's pretrial motion to consider all of his trial objections and motions under the Fifth, Sixth, Eighth, and Fourteenth Amendments, these additional constitutional claims are not forfeited on appeal. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.) In any event, "[a]s is our usual practice, we resolve defendant's multiple constitutional claims without separate discussion. Rejection of a claim on its merits necessarily disposes of the additional constitutional 'gloss.' " (*People v. Hartsch* (2010) 49 Cal.4th 472, 493, fn. 19.)

35

"The law favors the joinder of counts because such a course of action promotes efficiency." (*People v. Myles* (2012) 53 Cal.4th 1181, 1200.) Section 954 provides that "[a]n accusatory pleading may charge two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated." Even where the statutory requirements for joinder are satisfied, however, "a trial court has discretion to order that properly joined charges be tried separately." (*People v. Merriman* (2014) 60 Cal.4th 1, 37; see § 954.) "[A] defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant's severance motion." (*People v. Mendoza* (2000) 24 Cal.4th 130, 160 (*Mendoza*).)

Here, the statutory requirements for joinder were satisfied. The homicide charges included a burglary that is plainly of the same class of crimes as the subsequent burglaries. In addition, the underlying facts of each of the charged offenses share certain characteristics. Each offense occurred within a five-month period and within an eight-block radius of Morris's house in Palm Springs. Each incident took place in a residence between midnight and 3:00 a.m. The residences were structurally similar, and the perpetrator invariably entered through a sliding glass door. Further, although the subsequent burglaries were committed at different times and locations against different victims, they are " 'connected together in their commission' " to the homicide-related burglary because "they are . . . linked by a ' "common element of substantial importance" ' ": they all involved the intent to unlawfully take property. (*People v. Lucky* (1988) 45 Cal.3d 259, 276; see *ibid*. [" '[T]he element of intent to feloniously obtain property runs like a single thread through the various offenses.' "]; *Mendoza*, *supra*, 24 Cal.4th at p. 160 [each of the robberies and commercial burglaries involved the intent to

36

illegally obtain property].)  Under these circumstances, joinder of the offenses was permissible.  Therefore, Scott must make the requisite clear showing of prejudice to establish that the trial court abused its discretion in denying his severance motion.  (*Mendoza*, at pp. 160–161.)

"Refusal to sever may be an abuse of discretion where:  (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns into a capital case." (*People v. Sandoval* (1992) 4 Cal.4th 155, 172.)  In determining whether denial of the severance motion was an abuse of discretion, we examine the record before the trial court at the time of its ruling.  (*People v. McKinnon* (2011) 52 Cal.4th 610, 630.)

"Cross-admissibility is the crucial factor affecting prejudice.  [Citation.]  If evidence of one crime would be admissible in a separate trial of the other crime, prejudice is usually dispelled."  (*People v. Stitely* (2005) 35 Cal.4th 514, 531–532.)  As we explain further below, the subsequent burglaries and the burglary committed in connection with the homicide are sufficiently similar under the standard set forth in *People v. Ewoldt* (1994) 7 Cal.4th 380, 402, to support the inference that if Scott committed the subsequent burglaries, he probably harbored the same intent in burglarizing the murder victim's home.  Thus, evidence of the subsequent burglaries would have been cross-admissible at a separate trial of the homicide-related burglary charge to demonstrate his felonious intent to take property.  Moreover, no other circumstance supports an inference of prejudice here:  Evidence of the subsequent burglaries was unlikely to inflame the jury,

compared to the evidence of the sexual assault and killing of the 78-year-old murder victim. Although the evidence of the subsequent burglaries was solid, the potential for a spillover effect was minimal because the evidence against Scott on the homicide-related charges, including DNA evidence, was also substantial. And joinder of the subsequent burglary charges did not change a noncapital case into a capital case. In sum, Scott has not made a showing of prejudice that establishes an abuse of discretion by the trial court in denying his severance motion.

Scott further contends that the trial court's denial of his severance motion actually resulted in a fundamentally unfair trial in violation of due process of law. "Even if a trial court's severance or joinder ruling is correct at the time it was made, a reviewing court must reverse the judgment if the 'defendant shows that joinder actually resulted in "gross unfairness" amounting to a denial of due process.' " (*Mendoza*, *supra*, 24 Cal.4th at p. 162.) Scott argues that the prosecutor improperly urged the jury to consider the evidence of the subsequent burglaries as proof of his propensity to commit crimes, including all the homicide-related offenses. But Scott provides no citation to the assertedly improper argument in the record, and our review of the record reveals no such argument. Instead, the record shows that the prosecutor properly argued, consistent with the trial court's ruling and instructions to the jury, that the jury could consider evidence of the subsequent burglaries in determining whether Scott intended to steal property when he entered the murder victim's home.

Finally, Scott contends that his trial was fundamentally unfair because during the penalty phase, the prosecutor improperly argued that the jurors could consider evidence of the subsequent burglaries as an aggravating circumstance. (See § 190.3, factor (b) ["[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence"].) The prosecutor commented

that "you have people minding their own business in their own house, and again we have this screen door element, [defendant] coming in where he does not belong; [defendant] bringing his violence on people that are minding their own business." Scott's claim is that the prosecutor's reference to "people minding their own business in their own house" coupled with his reference to a "screen door element" reminded the jurors of *all* of the burglaries, including all of the subsequent burglaries, and thus misled them into believing all the burglaries were proper aggravating factors.

In context, however, the prosecutor referred to only two specific burglaries: the March 1988 incident involving Scott's attempted robberies of Thomas Meyer and Dan King, and the November 1992 burglary in which Scott assaulted Kenneth Osburn and Jeffrey Cole. Specifically, the prosecutor urged the jury to consider under factor (b) "the incidents involving Thomas Meyer and Dan King in March of 1988," during which Scott brandished a simulated weapon and demanded money from "people who are minding their own business . . . in their . . . camper." The prosecutor similarly argued that factor (b) applied to the "incidents with Jeffrey Cole and Kenneth Osburn," during which Scott threatened and demanded money from "people minding their own business in their own house, and again we have this screen door element." Evidence of these offenses was admissible as aggravating circumstances because each involved the use or attempted use of force or violence. (§ 190.3, factor (b).) We thus reject Scott's claims challenging the trial court's denial of his severance motion.

39

**B. Guilt Phase Issues**

*1. Other Crimes Evidence*

Scott contends that the trial court erred in admitting evidence of the four burglaries committed after the homicide to show he entered the murder victim's home with the intent to steal. (Evid. Code, § 1101, subd. (b).)

*a. Factual and Procedural Background*

At trial, the prosecutor sought to admit evidence of the subsequent burglaries to prove Scott's intent to steal when he entered Morris's home and to show a common design or plan in the commission of all of the burglaries. (Evid. Code, § 1101, subd. (b).) The prosecutor argued that the burglaries shared the following characteristics: (1) they were committed within an eight-block radius in Palm Springs; (2) they occurred between midnight and 3:00 a.m.; (3) the houses were of similar design and build; (4) the perpetrator entered each residence through a rear sliding door; and (5) the perpetrator took or attempted to take property in each instance. In addition, like the homicide that occurred during the burglary of Morris's residence, the burglary that occurred on November 4, 1992 (count 9), involved assaultive conduct. Over a defense objection, the trial court ruled the other-crimes evidence admissible on the issue of intent based on the first four similarities identified by the prosecutor.

*b. Discussion*

"Evidence of a person's *character*, also known as propensity evidence, is inadmissible to prove conduct in conformity with that character trait." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1170.) However, under Evidence Code section 1101, subdivision (b), evidence of other crimes "can be admitted for *other* relevant purposes, such as proving . . . intent," even if it is inadmissible "to prove the defendant had a disposition to commit similar bad acts." (*Villatoro*, at pp. 1170–1171, fns. omitted.) "In order to be admissible to prove intent, the uncharged

misconduct must be sufficiently similar to the charged offense to support the inference that the defendant probably acted with the same intent in each instance." (*People v. Lindberg* (2008) 45 Cal.4th 1, 23.)  " 'The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution.' " (*People v. Gallego* (1990) 52 Cal.3d 115, 171.)

Here, the fact that Scott committed the subsequent burglaries was relevant to the issue of intent on the burglary charge connected with the murder.  As noted, all of the burglaries shared a number of similarities.  Each occurred over a period of five months and within an eight-block radius in Palm Springs.  In each incident, Scott entered the house between midnight and 3:00 a.m. through a sliding glass door.  He took or attempted to take items from each house.  The residences had a similar design and build.  Based on these similarities, evidence of the subsequent burglaries would reasonably support an inference that Scott harbored the same intent to steal when he entered the murder victim's home.

Scott argues that admitting evidence of the subsequent burglaries allowed the jury to infer his propensity to commit burglary, including the burglary of the victim's home.  But during the guilt phase, the trial court instructed the jury under CALJIC No. 2.50 as follows:  "Evidence has been introduced for the purposes of showing that the defendant committed crimes other than that for which he is on trial.  This evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. . . .  [¶]  It may be considered by you only for the limited purposes of determining if it tends to show the existence of intent which is a necessary element of the crime of burglary.  For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as you do all other evidence in

41

the case.  You are not permitted to consider this evidence for any other purpose."
We presume the jurors followed the trial court's instructions.  (*People v. Houston*
(2012) 54 Cal.4th 1186, 1211.)

Scott also argues that evidence of the subsequent burglaries should have
been excluded because it might have been misused as evidence in aggravation in
the penalty trial.  Before counsel argued at the penalty trial, however, the trial
court limited the scope of evidence the jury could consider under section 190.3,
factor (b), to the evidence of the crimes committed during the March 1988 and
November 1992 incidents.  As discussed, the prosecutor did not suggest that
evidence of all of the subsequent burglaries could be considered in aggravation.
Under these circumstances, we are unable to conclude that the jury potentially
misused evidence of the August 1992 burglaries as aggravating factors.

Finally, Scott argues that the trial court should have excluded evidence of
the subsequent burglaries because it was cumulative to the prosecutor's other
evidence of Scott's intent to burglarize the murder victim's home and thus, under
Evidence Code section 352, its probative value was substantially outweighed by
the probability that its admission would confuse the jury or necessitate undue
consumption of time.  We disagree.  "Evidence that is identical in subject matter to
other evidence should not be excluded as 'cumulative' when it has greater
evidentiary weight or probative value."  (*People v. Mattson* (1990) 50 Cal.3d 826,
871.)  Here, the prosecutor's theory that Scott committed burglary was based on
evidence that he entered Morris's home with the sole intent to steal property.  It is
true that Webbie's missing wallet was probative of this intent.  But it is reasonable
to view the evidence of the subsequent burglaries as even more strongly probative
on this point.  Moreover, the jury was properly instructed on how to use the other-
crimes evidence, thereby minimizing any risk of confusion or undue consumption

42

of time.  Exclusion of this evidence under Evidence Code section 352 was not required.

In sum, the trial court did not abuse its discretion in admitting evidence of the subsequent burglaries for the limited purpose of proving Scott's intent to burglarize Morris's home.

### 2. *Murder Charge*

The indictment charged Scott with murdering Morris willfully and unlawfully and with malice aforethought in violation of section 187.  Scott was not charged specifically with first degree murder in violation of section 189, i.e., murder committed in the course of committing an enumerated felony.  On appeal, Scott raises a number of federal and state constitutional claims related to the failure to charge felony murder under section 189 separately from, and in addition to, charging murder with malice under section 187.  But we have previously rejected such arguments, including Scott's claim that the indictment's failure to separately allege a violation of section 189 violates *Apprendi v. New Jersey* (2000) 530 U.S. 466, and we decline to revisit our precedent.  (See *People v. Contreras* (2013) 58 Cal.4th 123, 147–149.)

### 3. *The Prosecution's Burden of Proof*

Scott claims that reversal is required because the trial court's instructions under CALJIC Nos. 2.01, 2.21.l, 2.21.2, 2.22, 2.27, 2.51, and 8.83 effectively reduced the prosecution's burden of proving his guilt beyond a reasonable doubt.

Preliminarily, the Attorney General contends that the doctrine of invited error procedurally bars Scott from presenting his claim on appeal because his trial counsel did not object to any of the guilt phase instructions and also requested and then withdrew his request that CALJIC No. 2.51 be given.  "Invited error, however, will only be found if counsel expresses a deliberate tactical purpose in

43

resisting or acceding to the complained-of instruction." (*People v. Valdez* (2004) 32 Cal.4th 73, 115.) Because the record does not show that counsel expressed a tactical basis for either making or withdrawing his request that CALJIC No. 2.51 be given, or for acceding to the court giving the remaining instructions, Scott's claim is not procedurally barred. To the extent Scott claims the instructions affected his substantial rights, we may review his claim under section 1259 despite the failure to raise this challenge below.

Scott contends that the instructions on circumstantial evidence (CALJIC Nos. 2.01 and 8.83) effectively told the jurors that if he "reasonably appeared" guilty, they could find him guilty even if they entertained a reasonable doubt as to guilt. As a result, Scott argues, these instructions reduced the prosecution's burden of proof beyond a reasonable doubt. In addition, he says, the instructions on the credibility and weight of the evidence (CALJIC Nos. 2.21.1, 2.21.2, and 2.22) and motive (CALJIC No. 2.51) similarly diluted the proof beyond a reasonable doubt standard because they informed the jury that it could decide material issues by determining which side had presented relatively stronger evidence. But we have rejected nearly identical claims, as Scott acknowledges, and we decline to revisit our precedent. (See *People v. Cook* (2007) 40 Cal.4th 1334, 1361–1362; *People v. Stewart* (2004) 33 Cal.4th 425, 521; *People v. Maury* (2003) 30 Cal.4th 342, 428; *People v. Millwee* (1998) 18 Cal.4th 96, 160; *People v. Crittenden* (1994) 9 Cal.4th 83, 142–144.)

## C. Penalty Phase Issues

### 1. Felony-Murder Special-Circumstance Allegations

The jury found true the felony-murder special-circumstance allegations that Scott murdered Morris during the commission of the crimes of burglary, rape, and sodomy. Each of these special circumstances standing alone made him eligible to

44

receive the death penalty. Scott contends that his death sentence violates the Eighth Amendment's proportionality requirement and international law because the prosecution was not required to prove he had a "culpable state of mind" with regard to the homicide. Again, as Scott acknowledges, we have rejected these contentions, and we decline to revisit our precedent. (See *People v. Rountree* (2013) 56 Cal.4th 823, 854; *People v. Watkins* (2012) 55 Cal.4th 999, 1034; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 194.)

### 2. *Victim Impact Evidence*

The trial court admitted three photographs offered by the prosecution as victim impact evidence under section 190.3, factor (a). Two photos had been taken over 30 years before the crimes: One depicted the victim in a dancing costume, and the other showed the victim with three children, one of whom was prosecution witness Raymond Abelin. The third was a photo of the victim in a costume with her brother Webbie taken at a performance some 11 years before the crime. On appeal, Scott contends that these photos were unduly prejudicial and beyond the scope of permissible victim impact evidence.

As an initial matter, we reject the Attorney General's assertion that the claim is forfeited because defense counsel objected solely on the ground that the evidence was cumulative under Evidence Code section 352. During argument on the objection, the parties addressed these issues, and the trial court, in denying the objection, stated that the photographs simply reflected milestones throughout the victim's life and thus did not pose a risk of undue prejudice that substantially outweighed its probative value. Under these circumstances, the claim is preserved for review. (Cf. *People v. Scott* (1978) 21 Cal.3d 284, 290 ["In a criminal case, the objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented"].)

45

Victim impact evidence is inadmissible at the penalty phase of a capital trial if it is "so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1180.) We have held that victim impact evidence may include photographs of the victim while alive and with family members. (See *People v. Edwards* (2013) 57 Cal.4th 658, 755.) The fact that the photos here were taken many years earlier during Morris's adult life does not cause them to fall outside of permissible parameters. The prosecutor used the photos to convey that the victim celebrated and enjoyed life to the fullest as a dancer. Having reviewed the photos, we agree with the trial court that they were "just ordinary pictures" that provided "a neat, brief, succinct" glimpse of the victim's life. We do not find the photos to be particularly inflammatory, and Scott cites nothing in the record to support his assertion that the prosecutor placed special emphasis on the photos in his closing argument.

### 3. Imposition of the Upper Term on Count 11 and Upper and Full Consecutive Terms as to Counts 2 and 3

The trial court imposed a determinate sentence of 35 years and eight months for Scott's convictions on the noncapital charges and enhancements. Scott claims that under *Cunningham v. California* (2007) 549 U.S. 270, imposition of this determinate sentence violated his Sixth Amendment right to a jury trial because the trial court relied on facts that were neither found by the jury nor admitted by him in imposing the upper term on count 11 (second robbery) and upper and full consecutive terms on counts 2 (rape) and 3 (sodomy). He additionally claims that remand for resentencing is required because the trial court erred by failing to state reasons for imposing full consecutive terms on counts 2 and 3 under section 667.6, subdivision (c), and merely incorporating by reference

the circumstances in the probation report as its statement of reasons for imposing his sentence. The claims are without merit.

*a. Factual and Procedural Background*

As noted, Scott was convicted of the special circumstances murder of Morris and the following offenses: five counts of first degree burglary (counts 1, 6–9); one count of rape (count 2); one count of sodomy (count 3); two counts of second degree robbery (counts 10 and 11); and two counts of assault with force likely to produce great bodily injury (counts 12 and 13). The trial court found true that Scott had suffered one prior serious felony conviction and had served one prior prison term. (§§ 667, 667.5, subd. (b).) Scott admitted the personal use of a deadly weapon allegations (§ 12022, subd. (b)) on counts 9 through 12.

After sentencing Scott to death on the capital charge, the trial court sentenced him to a determinate sentence of 35 years and eight months as follows: The court determined the robbery in count 11 was the principal term and, "for the reasons set forth in the probation report by weighing the aggravating and mitigating factors pursuant to the sentencing rules," imposed the upper term of five years plus a one-year enhancement for personal use of a deadly weapon. On counts 12 and 13, the court imposed a one-year term (one-third the midterm) for each conviction, to be served consecutively to count 11 "based upon the sentencing factors discussed . . . in the probation report" and then stayed each sentence pursuant to section 654. On counts 1 and counts 6 through 10, the court imposed a total term of seven years and eight months (the aggregate of the midterm for each conviction), consecutive "for the reasons previously stated." The court imposed a full consecutive eight-year upper term on counts 2 and 3 under section 667.6, subdivision (c), "for the reasons . . . stated in the [probation] report." For the true findings on the prior conviction (§ 667) and prior prison term

47

(§ 667.5, subd. (b)) allegations, the court imposed a sentence of five years and one year, respectively, each "full and consecutive for the reasons set forth [in the probation report]." The trial court stayed imposition of Scott's sentences on the enhancements for personal use of a deadly weapon on counts 9 and 12.

The probation report listed the following aggravating circumstances related to the crimes: (1) "the crimes involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness"; (2) "[t]the defendant was armed with or used a weapon at the time of the commission of the crime"; (3) "[t]he victim was particularly vulnerable"; (4) "[t]the manner in which the crime was carried out indicates planning, sophistication, or professionalism"; and (5) "[t]he crimes involved an attempted or actual taking or damage of great monetary value" (see Cal. Rules of Court, rule 4.421, (a)(1), (2), (3), (8), (9)).

The probation report also listed the following aggravating circumstances related to Scott: (1) "[t]he defendant has engaged in violent conduct which indicates a serious danger to society"; (2) "[t]he defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness"; (3) "[t]he defendant has served a prior prison term"; (4) "[t]he defendant was on probation or parole when the crime was committed"; and (5) "[t]he defendant's prior performance on probation or parole was unsatisfactory" (see Cal. Rules of Court, rule 4.421, (b)(1), (2), (3), (4), (5)).

### b. Discussion

"*Apprendi v. New Jersey* (2000) 530 U.S. 466 holds that, under the Sixth Amendment, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' [Citation.] In *Blakely v. Washington* (2004) 542 U.S. 296, the high court

48

extended the scope of *Apprendi* by defining 'statutory maximum' as the 'maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.' [Citations.] Applying *Blakely*, the court later held in *Cunningham v. California*, *supra*, 549 U.S. 270, that California's determinate sentencing law did not comport with a defendant's Sixth Amendment jury trial right. As *Cunningham* explained, 'If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied.' (*Id.* at p. 290.) Because the aggravating circumstances necessary for imposition of an upper term 'depend on facts found discretely and solely by the judge' (*id.* at p. 288), the 'statutory maximum' prescribed in California's sentencing scheme is not the upper term but rather the middle term. (*Ibid.*)" (*People v. Myles*, *supra*, 53 Cal.4th at p. 1220.)

In his reply brief, Scott acknowledges our decision in *People v. Black* (2007) 41 Cal.4th 799, 812 (*Black*), in which we concluded that under *Cunningham* "imposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions." (*Black*, at p. 816.) Moreover, as long as a single aggravating circumstance complying with *Cunningham* "renders a defendant *eligible* for the upper term sentence," "any additional fact finding engaged in by the trial court in selecting the appropriate sentence among the three available options does not violate the defendant's right to jury trial." (*Black*, at p. 812.)

The *Apprendi* rule does not apply to "the fact of a prior conviction." (*Apprendi*, *supra*, 530 U.S. at p. 490.) Under *Cunningham*, aggravating circumstances based on a defendant's criminal history that render the defendant

eligible for the upper term include a trial court's finding that the defendant suffered a prior conviction (*Black*, *supra*, 41 Cal.4th at pp. 818–820); that the defendant suffered prior convictions that are numerous or increasingly serious (*ibid*.); that the defendant was on probation or parole at the time the offense was committed (*People v. Towne* (2008) 44 Cal.4th 63, 80–81 (*Towne*)); and that the defendant performed unsatisfactorily while on probation or parole to the extent such unsatisfactory performance is established by the defendant's record of prior convictions (*id*. at p. 82).

Here, the aggravating circumstances enumerated in the probation report included, among others, the facts that Scott's prior convictions as an adult or his sustained petitions in juvenile delinquency proceedings were numerous or of increasing seriousness, that Scott was on probation or parole at the time of the crimes, and that Scott performed unsatisfactorily while on probation or parole. Because each of these aggravating circumstances was established by information obtained from Scott's criminal history records, each circumstance independently satisfies Sixth Amendment requirements under *Cunningham* and rendered him eligible for imposition of the upper term on counts 2, 3, and 11. (See *Towne*, *supra*, 44 Cal.4th at pp. 80–82; *Black*, *supra*, 41 Cal.4th at pp. 818–820.) Under these circumstances, the additional aggravating circumstance findings the trial court considered in deciding to impose the upper term on those counts did not violate Scott's right to a jury trial. (*Black*, at p. 812.)

In addition, as Scott also acknowledges in his reply brief, the high court has held that "the Sixth Amendment's restriction on judge-found facts" is "inapplicable" when a trial judge makes factual findings necessary to the imposition of consecutive terms. (*Oregon v. Ice* (2009) 555 U.S. 160, 170; *Black*, *supra*, 41 Cal.4th at p. 823; see also *People v. Wilson* (2008) 44 Cal.4th 758, 813 [rejecting defendant's claim that the trial court violated his 6th Amendment rights

by imposing full consecutive terms under § 667.6, subd. (d), "[b]ecause the *Cunningham*/*Black* rule does not apply to the sentencing choice to impose consecutive rather than concurrent sentences"].) Thus, Scott's claim that the trial court's imposition of consecutive sentences violated his Sixth Amendment right to a jury trial under *Cunningham* is without merit.

Scott further claims that the trial court erred by failing to state its reasons for imposing full consecutive terms under section 667.6, subdivision (c), for his convictions for rape (count 2) and sodomy (count 3) (*People v. Belmontes* (1983) 34 Cal.3d 335, 347–348), and by merely incorporating by reference the aggravating and mitigating circumstances in the probation report as its reasons for imposing the elevated, full, and consecutive terms for individual counts and the corresponding enhancements. Because Scott failed to object on these grounds at trial, he has forfeited the claims.

In *People v. Scott* (1994) 9 Cal.4th 331, 356, "this court prospectively announced a new rule: A party in a criminal case may not, on appeal, raise 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' if the party did not object to the sentence at trial. [Citation.] The rule applies to 'cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons.' " (*People v. Gonzalez* (2003) 31 Cal.4th 745, 751; see *People v. McCullough* (2013) 56 Cal.4th 589, 594–595, 597, 599.)

The sentencing hearing in this case was conducted in 1997. The record reveals that during the hearing, the trial court informed the parties of the sentence it intended to impose and provided counsel adequate opportunity to object both at the hearing and when it actually pronounced sentence and stated its reasons. (See

51

*People v. Gonzalez*, *supra*, 31 Cal.4th at p. 752 ["It is only if the trial court fails to give the parties any meaningful opportunity to object that the *Scott* rule becomes inapplicable"].) At no time during the sentencing hearing did Scott object on the grounds he now raises. Accordingly, the claims are forfeited on appeal.

### 4. Challenges to California's Death Penalty Law and Related Instructions

Scott raises numerous challenges under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the constitutionality of the California's death penalty law and its application to his case. Many of these claims concern standard instructions given at his penalty trial or instructions that the court declined to give at his request. We have previously rejected such claims as follows:

"Section 190.2 is not impermissibly broad in violation of the Eighth Amendment." (*People v. Loker* (2008) 44 Cal.4th 691, 755.) "The sentencing factor of 'circumstances of the crime' (§ 190.3, factor (a)) is not unconstitutionally vague and does not result in the arbitrary and capricious imposition of the death penalty." (*People v. Valencia* (2008) 43 Cal.4th 268, 310.) "[S]ection 190.3, factor (b) (violent criminal activity) is not vague. (*Tuilaepa v. California* (1994) 512 U.S. 967, 980.) Nothing bars use of the same crime under factor (b) and factor (c) (prior felony convictions). No sua sponte instruction against such double-counting is required." (*People v. DePriest* (2007) 42 Cal.4th 1, 59.)

"[T]he death penalty statute is not unconstitutional because it does not require 'unanimity as to the truth of aggravating circumstances, or findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence.' [Citation.] Nothing in *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, or *Apprendi v. New Jersey*

(2000) 530 U.S. 466, affects our conclusions in this regard. [Citations.] No burden of proof is constitutionally required, nor is the trial court required to instruct the jury that there is no burden of proof. [Citations.] That certain noncapital sentencing proceedings may assign a burden of proof to the prosecutor does not mean the death penalty statute violates a [capital] defendant's rights to equal protection or due process." (*People v. Dement* (2011) 53 Cal.4th 1, 55–56.) Written findings by the jury are not constitutionally required. (*People v. Morrison* (2004) 34 Cal.4th 698, 730.) "Use of prior criminal activity in aggravation was proper." (*People v. Livingston* (2012) 53 Cal.4th 1145, 1180.)

The trial court is not required to delete inapplicable sentencing factors from the jury instructions. (*People v. Jones* (2013) 57 Cal.4th 899, 980.) "The instruction that jurors may impose a death sentence only if the aggravating factors are ' "so substantial" ' in comparison to the mitigating circumstances that death is warranted does not create an unconstitutionally vague standard." (*People v. Carrington* (2009) 47 Cal.4th 145, 199.) The trial court is not required to instruct the jury that "statutory mitigating factors are relevant solely as potential mitigators" (*People v. Streeter* (2012) 54 Cal.4th 205, 268); that if the mitigating evidence outweighs the aggravating evidence, the jury must return a verdict of life without the possibility of parole (*People v. DeHoyos*, *supra*, 57 Cal.4th at p. 150); that there is a presumption of life (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 698); or that the jury could return a verdict of life without possibility of parole even if the circumstances in aggravation outweighed those in mitigation (*People v. Rogers* (2009) 46 Cal.4th 1136, 1179). "Including in the list of potential mitigating factors adjectives such as 'extreme' (§ 190.3, factors (d), (g)) and 'substantial' (*id*., factor (g)) does not erect an impermissible barrier to the jury's consideration of mitigating evidence." (*People v. Valdez* (2012) 55 Cal.4th 82, 180.)

CALJIC No. 8.88, which defines the scope of the jury's sentencing discretion under section 190.3, "does not prevent either the proper weighing of aggravating and mitigating factors, or an individualized sentencing determination. [Citation.]  The presumption that jurors understood such instructions, and particularly the concept of mitigation, is not rebutted by extraneous empirical claims." (*People v. DePriest*, *supra*, 42 Cal.4th at p. 60.)  Neither federal nor state law requires the court to give a lingering doubt instruction because this "concept is encompassed in section 190.3, factor (k) and related [standard capital case] instructions." (*Id.* at pp. 59–60.)

CALJIC Nos. 8.85 and 8.88 sufficiently convey to the jury that it can consider mercy and compassion for the defendant in determining the appropriate penalty.  (*People v. Thomas*, *supra*, 53 Cal.4th at p. 827.)  "The trial court did not err in declining defendant's request to define life imprisonment without the possibility of parole as meaning that he would stay in prison for the rest of his natural life." (*People v. DePriest*, *supra*, 42 Cal.4th at p. 58.)

"Intercase proportionality review is not required." (*People v. Livingston*, *supra*, 53 Cal.4th at p. 1180.)  "The California death penalty scheme does not violate equal protection by treating capital and noncapital defendants differently." (*Ibid.*)  "California's death penalty scheme does not violate international law and norms." (*People v. Mai* (2013) 57 Cal.4th 986, 1058.)

We decline to reconsider these precedents.

### 5. *Cumulative Error*

Scott contends that the cumulative effect of the asserted errors in his case requires reversal of his convictions and death sentence even if none individually compels reversal.  We conclude that any errors or assumed errors were not prejudicial.  We find no reversible error by considering the claims cumulatively.

54

## CONCLUSION

For the reasons above, we affirm the judgment.

**CONCURRING OPINION BY LIU, J.**


During jury selection, defendant Royce Lyn Scott objected to the prosecutor's peremptory strike of Prospective Juror H.R., an African American. (See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258.) The trial court found no prima facie case of discrimination but invited the prosecutor to state his reason for striking H.R. The prosecutor cited H.R.'s "inconsistent answers on the death penalty," and the trial court accepted that explanation as a valid race-neutral reason.

I agree that Scott's *Batson* claim lacks merit. But I would reject the claim on the ground that substantial evidence supports the trial court's ruling that the prosecutor offered a credible race-neutral explanation for striking H.R. Because the prosecutor stated a reason for the strike and the trial court ruled on that reason, the first stage of the *Batson* inquiry — i.e., whether Scott made a prima facie showing of discrimination — is moot. (See *People v. Banks* (2014) 59 Cal.4th 1113, 1146; *People v. McKinzie* (2012) 54 Cal.4th 1302, 1320.)

Today's opinion holds that the trial court's first-stage ruling is not moot and denies Scott's claim at the first stage without evaluating the prosecutor's stated reason for striking H.R. (Maj. opn., *ante*, at pp. 21–22, 32.) In so doing, the court

1

opts to resolve *Batson*'s inquiry into discriminatory purpose based on "needless and imperfect speculation" as to why the prosecutor might have struck H.R., even though "actual answers" to that question were stated by the prosecutor and evaluated by the trial court. (*Johnson v. California* (2005) 545 U.S. 162, 172 (*Johnson*).) This approach cannot be reconciled with the *Batson* framework and risks weakening the constitutional prohibition on racial discrimination in jury selection.

Under today's decision, when a prosecutor has stated a facially neutral reason that nonetheless reveals discrimination in light of all relevant circumstances, the *Batson* violation will evade appellate review so long as the trial court did not err in its first-stage ruling. This is readily illustrated by considering a variation on the facts of *Snyder v. Louisiana* (2008) 552 U.S. 472 (*Snyder*), a case in which the high court concluded, upon a careful review of all relevant circumstances, that the prosecutor's facially neutral explanation for a strike was in fact pretextual.

Suppose that during jury selection in a capital case involving a black defendant and a white victim, the prosecutor strikes a black prospective juror, and defense counsel objects. The trial court correctly finds no prima facie showing of discrimination because that juror was the only black juror struck among a handful of black jurors in the venire. The trial court nonetheless asks the prosecutor to explain the strike. She explains she struck the juror because he is a student teacher and might rush through deliberations to avoid missing class if he served on the jury. (*Snyder*, *supra*, 552 U.S. at p. 478.) The trial court finds this facially neutral explanation to be credible. (*Id.* at p. 479.) On appeal, however, a proper third-stage analysis reveals that the prosecutor's explanation was implausible: The trial would not have conflicted with the juror's teaching obligations, and the prosecutor

2

did not challenge similarly situated white jurors.  (*Id.* at pp. 482–484.)  Under today's opinion, a reviewing court would simply affirm the trial court's first-stage ruling.  It would not examine whether the prosecutor's facially neutral reason was supported by the record, nor would it conduct any comparative juror analysis.  As a result, it would not evaluate whether the pretextual nature of the prosecutor's stated reason, when considered with all other relevant circumstances, was sufficient to establish purposeful discrimination.

The court does not disagree that its approach mandates this result.  Yet this result is plainly at odds with *Batson*.  As the Third Circuit has explained, "to allow the absence of a *prima facie* case to be case dispositive when the record raises serious questions about the prosecutor's motivations would defeat one of *Batson*'s principal purposes — to provide assurance to the defendant and the community that criminal judgments are not tainted by invidious discrimination.  Where the record as a whole as ultimately developed permits a reasonable argument that the judgment is so tainted, the issue of taint must be resolved; it cannot be avoided by a finding that the defendant failed to present a *prima facie* case."  (*Johnson v. Love* (3d Cir. 1994) 40 F.3d 658, 665.)

Today's decision founders on a key question:  What role, if any, should the prosecutor's stated reason play in appellate review of a first-stage *Batson* ruling?  The court says "the fact that the prosecutor volunteered one or more nondiscriminatory reasons for excusing the juror is of no relevance at the first stage."  (Maj. opn., *ante*, at p. 29.)  I agree.  But today's opinion goes on to say that a reviewing court, as part of the first-stage inquiry, must take a peek at the stated reason to determine whether it is "discriminatory on its face."  (*Id.* at p. 30.)  If the stated reason is facially neutral and the first-stage ruling is correct, then the

3

reviewing court must affirm without examining whether the reason is contradicted by the record or otherwise suspicious.

As both parties here agree, however, a prosecutor's stated reason plays *no role* in the first-stage inquiry because the purpose of the first stage is only to determine *whether* the prosecutor must state a reason. When a prosecutor states a reason and a court inquires whether the stated reason is facially discriminatory, the analysis has necessarily moved past the first stage. Such inquiry properly occurs at *Batson*'s second stage, where the issue is whether the prosecution has carried its burden "to come forward with a neutral explanation." (*Batson*, *supra*, 476 U.S. at p. 97.) At that point, the analysis must take one of two paths: If the stated reason is discriminatory on its face, then a finding of purposeful discrimination is warranted. If the stated reason is facially neutral, then a court must proceed to *Batson*'s third stage and evaluate the reason "in light of all evidence with a bearing on it." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 252 (*Miller-El*).) Such evidence may include record material that supports or undermines the stated reason, the prosecutor's conduct of voir dire or pattern of strikes, the prosecutor's acceptance of jury panels with varying compositions, comparative juror analysis, and other factors. (See *Snyder*, *supra*, 552 U.S. at pp. 479–485; *Miller-El*, at pp. 241–266.) The third-stage inquiry will also take into account the evidence that was found insufficient to establish a prima facie case at the first stage.

Today's opinion scrambles this clear and well established procedure. According to the court, the second-stage inquiry into whether the prosecutor has stated a facially neutral reason may *backwardly* inform the first-stage inquiry into whether there is an inference of discriminatory purpose requiring the prosecutor to state a reason at all. (Maj. opn., *ante*, at p. 30 ["A proffered justification that is facially discriminatory must be weighed with the totality of the relevant facts to

4

determine whether they give rise to an inference of discriminatory purpose"]; *id.* at p. 31 ["facially discriminatory justification advanced by the prosecutor" at the second stage "would almost certainly [*almost* certainly?] raise an inference of discrimination" at the first stage].)  Further, the court says, if the stated reason is facially neutral and the first-stage ruling is correct, then appellate review must come to an end and ignore the trial court's third-stage ruling — regardless of whether the stated reason is supported by the record, whether the prosecutor struck other similarly situated jurors, or whether other aspects of jury selection suggest unlawful bias.  This approach — requiring a peek, but only a peek, at the prosecutor's stated reason — falls short of the fulsome analysis *Batson* requires to identify purposeful discrimination and ensure "public confidence in the fairness of our system of justice."  (*Batson*, *supra*, 476 U.S. at p. 87.)

The court says its approach balances several objectives:  (1) discovering and remedying discrimination, (2) preserving the use of unexplained peremptory challenges, and (3) encouraging the development of a record that will allow for efficient resolution of *Batson* claims on appeal.  (Maj. opn., *ante*, at pp. 26–27.)  As to the first two objectives, the *Batson* framework already reflects a balance that we are not free to redraw.  (See *Batson*, *supra*, 476 U.S. at pp. 98–99 ["While we recognize, of course, that the peremptory challenge occupies an important position in our trial procedures, we do not agree that our decision today will undermine the contribution the challenge generally makes to the administration of justice."].)

As to the third objective, today's opinion speculates that if reviewing courts deem the first stage moot and proceed to the third stage in this circumstance, trial courts "may be discouraged from ever making the threshold determination whether a prima facie case exists," and "prosecutors will not want to jeopardize the favorable [first-stage] ruling by placing their reasons on the record."  (Maj.

5

opn., *ante*, at p. 27.) Such a rule, the court fears, may result in situations where an appellate court overturns the trial court's first-stage ruling and must remand for a *Batson* hearing many years after trial.

Although these are plausible concerns, they do not provide a complete account of the incentives at work. If a trial court finds no prima facie case of discrimination, the prosecutor can choose to stand pat on that ruling. Or the prosecutor can choose to state a reason in order to create a record that will better support affirmance on appeal, to rebut a perceived affront to his or her fairness, or to promote transparency and confidence in the justice system. If the prosecutor decides to state a reason and the trial court finds it credible, the trial court's third-stage ruling is entitled to " 'much deference' " on appeal. (*Snyder*, *supra*, 552 U.S. at p. 479; see *id.* at p. 477.)

Under any of these scenarios, the prosecutor is exposed to little risk. As I have previously documented, in more than 100 cases presenting *Batson* issues over the past 24 years, this court has *never* found first-stage error on appellate review, and it has only *once* found third-stage error (in an obvious case). (See *People v. Chism* (2014) 58 Cal.4th 1266, 1352 (conc. & dis. opn. of Liu, J.); *People v. Harris* (2013) 57 Cal.4th 804, 885 (conc. opn. of Liu, J.).) Because our case law shows no sign of overenforcing *Batson* — that is, finding violations where stated reasons are actually nondiscriminatory — it is hard to say that a mootness rule would pose much if any disincentive for prosecutors to state reasons where the reasons are actually nondiscriminatory.

Moreover, in worrying about cases where an appellate court ends up overturning the trial court's first-stage ruling, today's opinion focuses on situations where a prosecutor has good reason not to stand pat on the first-stage ruling. In such cases, the vulnerability of the first-stage ruling is, in all likelihood,

6

already apparent when rendered by the trial court, and the prosecutor has a strong incentive to put the matter to rest by stating a reason for the record. That reason will be evaluated by the same trial court that already found no prima facie case of discrimination, and the trial court's credibility finding will be afforded deference on appeal. Moreover, even when the first-stage inquiry is moot on appeal, any weakness in the evidence of discrimination at the first stage will factor into the third-stage determination of whether the defendant has carried his "ultimate burden of persuasion regarding racial motivation." (*Purkett v. Elem* (1995) 514 U.S. 765, 768.) Thus, the marginal effect of the mootness rule in dissuading prosecutors from volunteering reasons is likely to be minimal in cases where a trial court's first-stage ruling is questionable. The marginal effect may be greater in cases where a trial court's first-stage ruling is solid, but those are cases where the trial court's first-stage ruling is virtually certain to be affirmed — i.e., cases where the prosecutor's refusal to state a reason is fully justified.

Of course, "the prospect that a strike motivated by unlawful bias could evade full review arises any time a trial court terminates the *Batson*/*Wheeler* inquiry at the first stage." (Maj. opn., *ante*, at p. 28.) But that is not a reason for reviewing courts to dispense with the usual and complete inquiry into unlawful bias when the prosecutor *has* stated a reason and the trial court *has* found it credible. Speculative concerns about prosecutorial incentives do not justify today's truncated approach, which insulates facially neutral reasons from appellate review. When "actual answers" have been stated by the prosecutor and evaluated by the trial court, "[t]he inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation . . . ." (*Johnson*, *supra*, 545 U.S. p. 172.) A reviewing court should not resolve a *Batson* claim by hypothesizing reasons for a strike, as the court does today (maj. opn.,

7

*ante*, at pp. 21–22), when it can readily examine the actual reason stated by the prosecutor and upheld by the trial court.

The plurality's reasoning in *Hernandez v. New York* (1991) 500 U.S. 352 (*Hernandez*) is persuasive. Although the trial court in *Hernandez* had skipped the first stage altogether, there is no indication that that fact played a role in the plurality's mootness analysis. The plurality explained by analogy to Title VII employment discrimination cases that " '[w]here the [employer] has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.' " (*Id.* at p. 359 (plur. opn. of Kennedy, J.).) It then made clear that "the same principle applies under *Batson*": "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." (*Ibid.*)

The court today says: "Because *Hernandez* explicitly found 'no error' when the New York appellate courts began *their* analysis with the trial court's first-stage ruling (*Hernandez*, *supra*, 500 U.S. at p. 372 (plur. opn. of Kennedy, J.)), we are confident that our analytical model falls within the discretion granted us by *Batson* and *Johnson*." (Maj. opn., *ante*, at p. 35.) But *Hernandez*'s finding of "no error" expressed nothing beyond agreement with the state courts' conclusions on the merits of the *Batson* claim: "[T]he prosecutor offered a race-neutral basis for his exercise of peremptory challenges," and "[t]he trial court did not commit clear error in choosing to believe the reasons given by the prosecutor." (*Hernandez*, at p. 372.) Indeed, in the sentence immediately following its finding of "no error," the plurality reiterated that the first-stage inquiry had been "unnecessary" on appeal. (*Ibid.*) Moreover, because *Hernandez* was a case where

8

the courts at all levels *proceeded* to a third-stage ruling, it provides no reason to be "confident" (maj. opn., *ante*, at p. 35) that a reviewing court may *end* the inquiry at the first stage without fully analyzing the prosecutor's stated reason. The high court in *Hernandez* had no occasion to consider that scenario, which is what we have here.

Today's opinion puts this court at odds with the majority of state high courts and federal circuit courts that have considered the issue, many of which have read *Hernandez* as I do. (See *Manning v. State* (Miss. 1998) 726 So.2d 1152, 1183, overruled on another ground in *Weatherspoon v. State* (Miss. 1999) 732 So.2d 158 [quoting *Hernandez* and concluding that because trial court ruled on prosecutor's stated reason, "the issue of whether a prima facie showing was made is moot"]; *State v. Williams* (N.C. 2002) 565 S.E.2d 609, 638–639 [quoting *Hernandez* and concluding that because trial court ruled on validity of prosecutor's explanations, " 'the only issue for us to determine is whether the trial court correctly concluded that the prosecutor had not intentionally discriminated' "]; *Malone v. State* (Tex.Crim.App. 1996) 919 S.W.2d 410, 412 [quoting *Hernandez* and stating that "we, like the Supreme Court, will not review the issue of whether the defendant established a *prima facie* case where the prosecutor has articulated reasons for the contested peremptory strike and the trial judge has ruled on the ultimate question of intentional discrimination"]; *Johnson v. Love*, *supra*, 40 F.3d at p. 665; *United States v. Castorena-Jaime* (10th Cir. 2002) 285 F.3d 916, 928; see also *Stubbs v. Gomez* (9th Cir. 1999) 189 F.3d 1099, 1104–1105 [on federal habeas corpus review, prosecutor's stated reasons and federal district court's ruling on those reasons rendered first-stage inquiry moot even though state court determined there was no prima facie showing]; *People v. Boyette* (2002) 29 Cal.4th 381, 469–470 (dis. opn. of Kennard, J.) [citing cases

from intermediate state appellate courts holding that trial court's ruling on prosecutor's stated reasons renders the first stage moot, despite first-stage ruling that there was no prima facie showing].)  Tallying authority is of course no substitute for legal reasoning.  But the number of jurisdictions that treat the first stage as moot under these circumstances — and have long done so — casts doubt on the practical concerns emphasized in today's opinion.

The court dismisses these non-California decisions as a "handful of cases." (Maj. opn., *ante*, at p. 34.)  Apart from our own inconsistent precedent, today's opinion cites an unpublished disposition (*United States v. Ervin* (6th Cir. 2008) 266 Fed.Appx. 428, 432–433), an opinion explicitly distinguishing mootness procedures on habeas corpus from those on direct review (*Sorto v. Herbert* (2d Cir. 2007) 497 F.3d 163, 175, fn. 9), one sentence of dicta (*State v. Joe* (La. Ct. App. 1996) 678 So.2d 586, 591), a decision from an intermediate state appellate court that is contradicted by another division of the same court (compare *People v. Bruton* (2002) 735 N.Y.S.3d 231, 232, with *People v. Dalhouse* (1997) 658 N.Y.S.2d 408, 410), a case in which the trial court made no third-stage ruling (*Brawner v. State* (Miss. 2004) 872 So.2d 1, 10–11), and a single relevant state high court opinion (*State v. Sledd* (Kan. 1992) 825 P.2d 114, 119).  If the cases I have cited are a mere handful, then the pertinent non-California authority cited by the court could fit in a thimble.

Because the first-stage inquiry is moot, I would analyze Scott's *Batson* challenge at the third stage.  H.R.'s responses on the juror questionnaire indicated that he simultaneously held four inconsistent attitudes about the death penalty. When asked about these attitudes during voir dire, H.R. did little to clarify his views.  In light of H.R.'s written and oral responses, the trial court had ample basis to credit the prosecutor's facially neutral explanation for striking H.R.

10

Comparative juror analysis does not aid Scott's claim.  No other prospective juror expressed death penalty views as inconsistent or confusing as H.R.'s.

In sum, I would reject Scott's *Batson* claim as to H.R. at the third stage rather than the first stage.  In all other respects, I join the court's opinion.

**LIU, J.**


**I CONCUR:  KRUGER, J.**

11

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Scott

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S064858
**Date Filed:** June 8, 2015

_____

**Court:** Superior
**County:** Riverside
**Judge:** H. Morgan Dougherty

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Susan Ten Kwan and Arnold Erickson, Deputy State Public Defenders, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Jennifer A. Jadovitz, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Arnold Erickson
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607-4139
(510) 267-3367

Jennifer A. Jadovitz
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 645-2204