Filed 12/10/21  P. v. Williams CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>THOMAS WILLIAMS,<br><br>        Defendant and Appellant. | A155912<br><br>(Contra Costa County<br>Super. Ct. No. 51705326) |

Thomas Williams was convicted of first degree murder in the shooting of his ex-girlfriend at a convenience store in Antioch, and of premeditated and deliberate attempted murder of a store clerk.  There is no dispute who was responsible for the shootings, and no dispute as to the fact of malice murder.  On appeal, defendant argues that the trial court erred in denying his *Batson*/*Wheeler*[1] challenge to the prosecutor's exercise of a peremptory challenge, but candidly concedes that he is "swimming against the tide" by asking this court to decide the case contrary to binding California Supreme Court precedent, a position he recognizes we cannot take.  (See *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455.)  We readily dispose of this argument and find it has no merit.  Defendant also argues that the

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

1

trial court erred in admitting evidence of prior acts of domestic violence against his former wife under Evidence Code section 1109. We find no error and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution Case*

Baldev Sangha owned the QuikStop on West Tragallas Road in Antioch. The store opened out to a parking lot and had 11 surveillance cameras. On May 2, 2016, Sangha heard a commotion and Thomas Payne, a store clerk, hollering for help. Sangha went to the front of the store and saw Payne on the ground bleeding, and a woman also on the ground who he recognized as a regular customer.

Payne, the wounded store clerk, testified that Cynthia Flores-Crose, a regular QuikStop customer, was at the store in the early morning on May 2, purchasing her usual cigarettes and a beverage. She seemed "stressed," "anxious" and "noticeably shaken," and told Payne she was having an argument with her ex-boyfriend that she had moved to Antioch to get away from. After Flores-Crose left the store, Payne went outside to sweep the parking lot, and saw her sitting in her car with the door open, talking to a man (later identified as defendant) who was in his black car. Flores-Crose continued to appear stressed and shaken, and Payne continued to keep an eye on her even when he went back into the store. He saw Flores-Crose try to make her way back into the store and saw defendant drive aggressively, accelerating and stopping his car and trying to run her over with his car. Flores-Crose made her way back into the store and was crying. Defendant followed her into the store, looking "[a]ngry, aggressive, irritated." Payne told him to leave. Defendant pushed him aside and struck Flores-Crose in the head. Defendant immediately left the store, and Payne grabbed for a

2

baseball bat.  Defendant reentered the store, this time with a .38 caliber revolver.  He fired a round aimed at Payne, and then went over to Flores-Crose and shot her in the head, before turning around and shooting Payne in the arm.

Payne's 911 call was played for the jury.  Photos and video footage from the store's surveillance cameras capturing the incident were also shown to the jury.

Brian Schmid, who was a customer at the convenience store that morning, testified that he saw a "quarrel between a boyfriend-girlfriend" in the parking lot.  It would turn out the people were defendant and Flores-Crose.  The woman was standing outside a car and was distressed and scared; Schmid heard her say "please just stop."  Someone was in the car revving the engine every time she tried to cross the parking lot; "[s]he was trying to cross and he wasn't allowing her."  Schmid went into the store to buy something, and as he left, the woman entered.  Then Schmid saw the person get out of the car, which he had pulled right up to the door of the store, go into the store and punch Flores-Crose hard in the face.  The man then left the store, went back to the car and came out with a revolver.  Gun in hand, he went back into the store and fired his gun at the store clerk. Schmid heard shots and ran.

Wendy Chastain, Flores-Crose's mother, testified that defendant was her daughter's former boyfriend.  On the night before the shooting, Flores-Crose seemed nervous and upset.  She and defendant were in a dispute about the pink slip to a car that defendant insisted on obtaining, and his emails to Flores-Crose had scared her.  Chastain testified that her daughter had said three separate times that she feared for her life.  Flores-Crose had tried to block defendant from accessing her cell phone and social media accounts.

Others also testified about Flores-Crose's fear of defendant. Linda Melendez, a close friend who considered Flores-Crose like a daughter, testified that defendant had threatened to kill Flores-Crose if he didn't get the pink slip to the Dodge Charger. Christina Melendez, with whom Flores-Crose resided after she left defendant, testified that Flores-Crose was afraid of defendant. Christina advised her to mail the pink slip to defendant and not meet with him in person. Flores-Crose told Christina that if she ever "went missing, you know where to look."

On the morning she was murdered, Flores-Crose left Christina's house to start a care-giving job with a new company, and she seemed happy. Christina testified that Flores-Crose had a regular morning routine of stopping off at the QuikStop nearby to buy cigarettes and an energy drink.

Joanna Tapia Garner, defendant's ex-wife and mother of two of his children, testified about prior incidents of domestic violence that defendant committed against her. They were married from 2003 to 2011.

Within the first year of their relationship, Garner tried to end it; defendant did not want the relationship to end, and his response was to strangle her. She called the police, but a few weeks later she got back together with defendant and eventually they were married.

Another time around 2007, Garner and defendant were having a conversation, and defendant became angry and strangled and kicked her. Garner yelled out to their young son to get the phone so she could call the police. Defendant got the phone from her so she was unable to make the call.

After Garner decided to separate from defendant, she received threats from defendant "quite often." He threatened that she was not going to take his children away from him, and that she would regret the decision. They were divorced in 2011. Once when she dropped off the children to spend the

weekend with him, at a point when defendant knew Garner was going to marry someone else, she rolled down the window of her vehicle thinking he was walking over to say something to her; instead, defendant slapped her on the face. She drove off and went immediately to the Oakland Police Department. Shortly after this happened, she received a voicemail message from him that said "[n]ot to be surprised if he cut my fucking head off." Garner testified she was "often" afraid of defendant, and got threatening messages from him so often that she "tried not to let it get to me." Garner knew Cynthia Flores-Crose as defendant's girlfriend and tried to warn her about defendant.

B.     *Defense Case*

Defendant offered his own testimony. Defendant had lived with Flores-Crose for five years; their relationship ended in September 2015 due to "stress." Defendant denied there was any violence or verbal abuse. Flores-Crose had a mother-like relationship with his children. Defendant continued to see Flores-Crose about once per month after they broke up, until April 2016. In April, Flores-Crose wanted to spend the night with him but he "couldn't make time." She thought he was avoiding her or seeing someone else. He claimed he loved her.

He bought a car in 2014 and put it under her name "to build her credit," and made all of the payments. He wanted title to the car so he could transfer it to his son when the son turned 16. Starting in March 2016, he asked her about title every week or every other week. He denied being angry about it. He admitted sending e-mails and texts about it.

On the morning of May 2, 2016, defendant stopped off at the QuikStop convenience store to buy snacks for his kids and saw Flores-Crose in the parking lot. He parked his car near hers. They had a conversation about

5

what was going on with work and the kids, and about reconciling. He wanted her to go with him that day. She told him no; she wanted to leave and get to her new job for training. Defendant told her that his kids kept asking about her, were depressed when he had them on weekends, and that she didn't understand how important she was to them. Flores-Crose indicated they were not going to get back together. She told him to leave, but he didn't. She said if he did not leave, she would make a "scene." She went into the store.

He did not remember anything that happened after that. When he left the convenience store he planned to turn himself in to the police.

On cross-examination, defendant denied driving aggressively in the parking lot and revving his engine at Flores-Cross to block her movements; he chalked it all up to "the transmission was slipping." He also denied slapping his ex-wife Garner in 2011, and said he never choked or grabbed her by the neck. He had, however, "kicked her out," and spit on her when learning she had been unfaithful. He admitted telling her that he was going to cut her head off, which he said was "out of anger."

C.  *Verdict*

Defendant was found guilty as charged of murder and attempted murder (Pen. Code, §§ 187, subd. (a)), 664). The jury found true the enhancement allegations of personal and intentional discharge of a firearm that were charged with each count. (*Id.*, § 12022.53, subd. (d)).

**DISCUSSION**

A.  *Batson/Wheeler Challenge*

Williams argues that the trial court violated his state and federal constitutional rights when it overruled his *Batson*/*Wheeler* objection to the

6

prosecutor's peremptory challenge of prospective Juror S., an African American woman.[2]  We are not persuaded.

1.    Additional Facts

The trial court generally questioned the first group of 21 jurors following up, where applicable, on each juror's responses to the jury questionnaire.  When the judge came to Juror S., the judge noted that in her response to the jury questionnaire she had "mention[ed]" that she "kn[e]w law enforcement people."  Juror S. said her uncle and aunt were "retired San Quentin," but they had "not really" shared work stories.  The judge then asked the following, apparently referring to the jury instruction about witnesses:

"[THE COURT]:  How do you feel about that witness instruction?  Can you follow that instruction?

"[JUROR S.]:  Yes.

"[THE COURT]:  Okay.  Then you said on this form that you had an opinion or attitude about the criminal justice system which would make it difficult for you to be fair to both sides.

"[JUROR S.]: Well—

"[THE COURT]:  What did you mean by that?

"[JUROR S.]:  I have opinions.

"[THE COURT]:  Okay.  What opinion?

"[JUROR S.]:  That they all don't tell the truth and they're not fair.

"[THE COURT]:  Okay.  I wasn't—you sort of dropped your voice so I didn't quite hear what you were saying.  Did you say that you had a negative opinion of law enforcement?

"[JUROR S.]:  Some cases, yes, by my own interactions.

_____

[2] We use the juror's initial for confidentiality.

7

"[THE COURT]: Okay. And that's what you were referring to when you said you had an opinion or attitude about the criminal justice system?

"[JUROR S.]: Yes."

The court referred to questions it had asked other jurors on the topic, and asked whether "given that you have negative opinions" Juror S. thought law enforcement witnesses are "going to start off from the same point or are they going to be behind all the other witnesses that testify in the case?" Juror S. replied, "[t]hey'll start from the same point," and answered "yeah" when the court asked whether she could "check that [negative feeling] at the door."

Then the judge asked whether her negative opinion was based on what she had read or on personal experience. She replied in response to questions that it was based on "[m]y own personal interactions," most recently about 10 years ago in Contra Costa County. The agency involved was "RPD"— presumably Richmond Police Department, in the city where Juror S. said she lived. The court asked for details and context. The juror responded:

"[JUROR S.]: They assumed that I was in a drive-by shooting, pulled me over, guns drawn, everything.

"[THE COURT]: So you were just driving on your way to some place?

"[JUROR S.]: I was picking my sister up from high school.

"[THE COURT]: Minding your own business?

"[JUROR S.]: Minding my own business.

"[THE COURT]: So you felt that you were treated very unfairly in that last incident?

"[JUROR S.]: And the ones before that, yes."

The prosecutor followed up on Juror S.'s experience with police officers in Richmond, asking how she felt about police officers today. Juror S. replied,

"Ten years ago, I was really upset then. Do I look like I was just in a shoot out? No. I just picked my sister up from school. Did I drive a '74—let a boyfriend drive my car. No, no, no. So, yeah, I was mad then. I haven't had any since then. But, yeah, I was upset."

The discussion continued:

"[PROSECUTOR]: But it sounds like even today when you talked to the Court, that you still held a residual frustration because you have that; is that fair to say?

"[JUROR S.]: Yes and no."

When Juror S. was asked to explain her response, she said, "I do feel like police lie, yeah. Do I feel like they be wrong? Yes."

The prosecutor asked a series of questions about everyone having the potential to lie and be wrong and asserted that police officers are "people like we are," to which the prospective juror seemed to respond affirmatively. Then the prosecutor asked whether Juror S.'s "beliefs and knowledge that [police officers] lie and that they . . . take advantage, or . . . whatever they do, is so strong that you're going to look at them skeptically from the beginning . . . with no other basis except for the fact" that they are a police officer. Juror S. responded no. She also answered affirmatively when the prosecutor sought agreement that Juror S. would "look at them objectively and listen to them equal as any other witness" and "won't give them any discount."

The prosecutor then asked about Juror S.'s planned vacation trip (a concern she expressed earlier in voir dire). Juror S. replied, "Well, I got clarification going to be done before August 16th." The prosecutor alluded to Juror S. having conveyed there was a sense of real anxiety on her part about the trip. Juror S. interjected, "Unforeseen stuff happens. We didn't come to court on Friday. Friday should have been a regular working business day

9

court on Friday. And, you know, something else could happen. I just wanted to let you all know I didn't pay for this trip for a whole year—just wanted to let you know and make sure that I was going to be out here by August 16th." The prosecutor followed up with more questions about the planned vacation, stating "we want someone that cannot have something going on in their own personal life distracting them from their ability to deliberate," and that she needed "to make sure if you are selected, you can sit here and listen to the— during the time of trial." Juror S. responded, "Up to August 12th, yes."

The next day the prosecutor exercised its first peremptory challenge against Juror S., and at sidebar and off the record, defense counsel made a *Batson/Wheeler* challenge. The court later recounted the sidebar conference for the record:

"THE COURT: [Juror S.] was number nine. That was the first challenge . . . that the People used. And at side-bar . . . you felt that she had explained herself adequately, that this was not race neutral, and was used for an improper purpose, and I denied that at the side-bar.

"My reason for denying it at the side-bar was I didn't feel like you had made a prima facie case. Because while she is a member of a protected group, she had through the questioning with me, before we even get to the prosecution's question, behaved in a strange way, some of which I had put on the record.

"In seeking a hardship, for example, she repeatedly refused to accept the assurance that the Court gave her about the completion date of the trial. I always understand why they won't do that the first time, maybe. But then we were on at least the third time and she was still rolling her eyes at me about my assurances.

10

"Then in my questioning of her, she was—I felt like I was wrestling the answers out of her. So I didn't feel like there was anything surprising when that challenge was used. And it was the first challenge that the People have used.

"And so while in principle there's nothing preventing the exercise of a first challenge on, you know, [a] member of a protected class rising to the level of a prima facie case, I just didn't think the facts here were such that they did.

"But I said I would let you make a record and let you both make a record. So why don't you do so?"

Defense counsel responded that he "had nothing more to add. I think the Court accurately summarized my position during side-bar discussion. I have nothing more to add. I'll submit."

The prosecutor then spoke:

"[PROSECUTOR]: . . . I actually think that there really hasn't been an articulation of [defense counsel's] objection. It's highly inflammatory to accuse, on the very first peremptory, that the People are improperly, with no basis, except for a record that we had with the Court immediately putting a record of her anger and her upset.

"I think that there needs to be a little bit more as to the basis of his allegations against the People. . . . There was no pattern. . . ."

The court interjected that the exercise even of a first peremptory challenge could theoretically be improper. The prosecutor agreed, but asserted that there needed to be a record as to the "explicit objection" made, not just a generalized one.

The prosecutor wanted to make a record as to why she struck the juror, even though the court said that she need not do so because it had not found

11

that there was a prima facie showing. The court permitted her to do so. She stated that she had "passed" the jury "multiple different times," that Juror S. was an African American woman, and that there are two other African American women sitting on the jury panel that she had "passed multiple times," as well as the fact that there were "lots of women that are seated currently."

The prosecutor then stated what she believed had been the "specific objections" made by defense at side-bar. "My understanding . . . is that he said that [Juror S.] did indicate she had some issues with law enforcement, but then she said she could set it aside and be fair. [¶] If that were the standard, I could have *Wheeler* or *Johnson* objected to every single peremptory the defense counsel made [giving names of jurors]. [¶] And so that's why I think it needs to be a little bit more clear. Because when a juror tells somebody in a courtroom that she was pulled over. She . . . doesn't like the police because she's pulled over . . . with guns drawn at her in a car with her sister. And she had the reaction that she had ten years later that she had in court here, where she was very upset about that. . . . [S]he's implied bias. She says she's going to set it aside. Her demeanor demonstrated that she's unwilling to do that, or incapable."

The court asked if there was anything anyone wanted to add. The prosecutor continued that "the specific objection should be laid so that if later there is something else that comes up, the Court has the ability to make that comparative analysis." The court replied, "Well, I think that's true. I think to complete the record, also, on Juror [S.'s] . . . form, she did check off that she had an opinion about the criminal justice system which would make it difficult for her to be fair."

Defense counsel responded, "I'm submitting."

12

2.      Applicable Law and Standard of Review

"Both the United States and California Constitutions prohibit discriminatory use of peremptory strikes." (*People v. Reed* (2018) 4 Cal.5th 989, 999.)  "A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges.  First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria.  Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge.  Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination. (*People v. Lenix* (2008) 44 Cal.4th 602, 612.)  'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from the [defendant].' (*Id.* at pp. 612-613.)"  (*People v. Manibusan* (2013) 58 Cal.4th 40, 75.)

A defendant makes a prima facie case by showing that "the totality of the relevant facts ' "gives rise to an inference of discriminatory purpose." ' " (*People v. Scott* (2015) 61 Cal.4th 363, 384 (*Scott*), quoting *Johnson v. California* (2005) 545 U.S. 162, 168.)  Whether a prima facie case exists depends upon "the entire record of voir dire as of the time the motion was made," and "certain types of evidence may prove particularly relevant." (*Scott, supra*, 61 Cal.4th at p. 384.)  "Among these are that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of the remaining jurors belong. [Citation.]  A court may also consider nondiscriminatory reasons for a

13

peremptory challenge that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias." (*Ibid.*)

When a trial court finds that the defendant failed to establish a prima facie case of purposeful discrimination, we review the record, including voir dire and any jury questionnaires, to determine whether substantial evidence supports the ruling. (*People v. Griffin* (2004) 33 Cal.4th 536, 555 (*Griffin*), disapproved on another ground as recognized in *People v. McDaniel* (2021) 12 Cal.5th 97, 142.) "We sustain the ruling when the record discloses grounds upon which the prosecutor properly might have exercised the peremptory challenge[ ] against the prospective juror[] in question." (*Griffin* at p. 555.) If the trial court finds that no prima facie case has been made, the court may nevertheless offer the prosecution an opportunity to state its reasons for dismissing the challenged juror, as happened here. (*Scott*, *supra*, 61 Cal.4th at p. 388.) And even if the prosecution provides nondiscriminatory reasons and the trial court determines that the reasons are genuine, the reviewing court begins its analysis of the denial of the challenge with a review of the first-stage finding that no prima facie case was made. (*Id.* at p. 391.) If the reviewing court determines that the trial court's finding on the first-stage issue is supported by substantial evidence, the claim is resolved without consideration of the third-stage ruling. (*Ibid.*) If the reviewing court determines that the first-stage ruling was in error, it proceeds to review the third-stage ruling without the need for a remand to the trial court. (*Ibid.*)

3. *Analysis*

Substantial evidence supports the trial court's finding that defendant did not make a prima facie showing that the prosecution dismissed Juror S. for the improper reason that she was an African American woman. (See *Scott, supra,* 61 Cal.4th at p. 384.)

14

This was a first stage challenge; the court explicitly found there was no prima facie case, and although it permitted the prosecutor to make a record, the court did not rule on the prosecutor's reasons for her challenge. That the trial court noted the juror's response on a questionnaire in order "to complete the record" did not transform this into a third stage ruling.

Defendant's counsel permitted the court to make the record of his *Batson*/*Wheeler* motion and did not disagree with the court's description. The court characterized the *Batson*/*Wheeler* motion as "you felt [Juror S.] had explained herself adequately, that this was not race neutral, and was used for an improper purpose." Given the opportunity to add to the record, defense counsel agreed that this "adequately summarized my position" and said no more.

The trial court did not err. This was the prosecutor's first peremptory challenge and there were apparently two other African American jurors on the panel who, at the time the *Batson*/*Wheeler* challenge was memorialized, the prosecutor had not challenged. Defendant is not African American, nor were his victims.[3] The prosecution's voir dire of Juror S. was not desultory; to the contrary, the prosecutor probed whether the prospective juror could set aside her possible bias and decide the case fairly to both sides. Despite Juror S.'s statement at the end of questioning by the prosecutor that she could listen to witnesses fairly, this came after she had expressed in her jury questionnaire that she could not be fair and after she had disclosed a painful incident at the hands of the Richmond Police Department. In addition, there was another nondiscriminatory reason that was apparent on the record:

---

[3] Although there is no cite to the record, defendant does not dispute the Attorney General's assertion that neither defendant nor the victims (Flores-Croses and Payne) were members of a cognizable group.

Juror S.'s concern and reluctance, which the prosecutor probed, about serving on a jury with her long-standing paid-for vacation coming close after the anticipated end of the trial. Juror S. appeared to criticize the court for not having been in session the previous Friday (a "regular working business day"), as if the court was squandering valuable time that might affect her planned vacation, just as other "unforeseen stuff" might. Juror S.'s reluctance to serve on the jury is a nondiscriminatory reason for challenging her. (See *Griffin, supra,* 33 Cal.4th at p. 555.)

Defendant now argues on appeal that the prosecution's "stated reason" for exercising the challenge did not rise to the level of a "specific bias." We find this argument without merit. Under *Scott,* in a first stage ruling, the trial court does not evaluate the prosecutor's stated reason for the challenge. (*Scott, supra,* 61 Cal.4th at pp. 382-383.)[4] The trial court may find the non-existence of a prima facie case without ever asking the other side for a reason. Moreover, defendant's argument that "police witnesses had no role to play at this trial" and thus distrust of police could not be an actual specific bias in this case is unsupported by any cite to the record. Nor is it accurate. Our review shows the prosecution called at least five witnesses affiliated with law enforcement agencies, and they testified about topics including the crime scene, recovery of evidence, cell and text records, and 911 calls. When the trial court read the list of prospective witnesses to see if the prospective jurors were familiar with any of the names, it included many persons

---

[4] Defendant asserts our Supreme Court "should reconsider" its ruling in *Scott,* and by extension the cases that rely on *Scott,* such as *People v. Krebs* (2019) 8 Cal.5th 265. We do not address this argument. In his reply brief on appeal, defendant also notes that in September 2020 the Legislature passed Assembly Bill No. 3070 to enact a new Code of Civil Procedure section 231.7 which will apply, by its terms, to trials where jury selection begins on or after January 1, 2022.

identified as affiliated with the Antioch Police Department who were not called to testify.

In sum, the court did not err in denying the *Batson/Wheeler* challenge in this case.

B.  *Admission of Evidence of Prior Domestic Violence*

Defendant asserts the trial court erred in admitting his ex-wife Garner's testimony about his prior acts of domestic violence from 2003 and 2011 on the ground that this testimony was not relevant, and that the admission of these acts violated his due process rights.  As we have summarized, these uncharged acts consisted of strangulation, threats of violence, slapping and kicking.  We find no prejudicial error in the admission of this evidence.

1.  Applicable Law and Standard of Review

Although character or propensity evidence, including evidence of a person's prior conduct, is generally inadmissible to prove the person's conduct on a specific occasion (Evid. Code,[5] § 1101, subd. (a)), the Legislature has created a specific exception to the rule where a defendant is charged with an offense involving domestic violence.  (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.)  In that case section 1109 provides that evidence that the defendant committed other domestic violence is not made inadmissible by section 1101 so long as it is not inadmissible under section 352.  In other words, subject to weighing the factors called out in section 352, evidence of other domestic violence may be admissible to show a defendant's propensity to commit the charged offense.

There is an additional hurdle to admissibility for evidence of acts occurring more than 10 years before the charged offense.  That evidence is

_____

[5] All further unspecified statutory references are to the Evidence Code.

17

inadmissible, unless the court also determines that the "admission of this evidence is in the interest of justice." (§ 1109, subd. (e).)

Under section 352, a trial court may exclude relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice. For purposes of section 352, evidence is unduly prejudicial if it "uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues." (*People v. Carter* (2005) 36 Cal.4th 1114, 1168.) "Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent." (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1008.)

We review the trial court's ruling on the admissibility of evidence for abuse of discretion. (*People v. Disa* (2016) 1 Cal.App.5th 654, 672.)

2.    *Additional Facts*

The prosecution filed a motion in limine to allow admission of three prior uncharged acts of domestic violence, dating from 2000, 2003, and 2011. The prosecutor argued they were admissible under section 1109 and also under section 1101, subdivision (b) as relevant to show defendant's intent, lack of mistake, identity, and common scheme or plan. Defendant filed a motion in limine seeking to exclude the 2000 and 2003 incidents because they were over 10 years old and inadmissible under section 1109, subdivision (e), and the 2011 incident because it was more prejudicial than probative.

The court conducted three separate hearings on the issue over the course of three days.

The trial court ruled Garner could testify about the 2003 and 2011 incidents, but excluded testimony from another witness about an incident in 2002.

18

As to the 2003 incident, the court acknowledged it was over 10 years old but found admission of evidence of the incident was in the interest of justice, reasoning: "[o]n the interest of justice analysis, it seems to me that since [Garner] is testifying already and is already testifying to an incident that the Court is determining is admissible for the reasons that I will discuss, to exclude her testimony from her earlier incident [referring to 2003] based on the fact that it is time barred by the ten-year rule seems to me would be ignoring the very purpose of the statute, and would not be in the interest of justice.

"It would, for example, give a completely false impression to the jury that the incident that is being related by [Garner] more recently [referring to 2011] is the only incident that is involved, and it would twist the character of the description that she would give either of the incident itself or of her fear of the defendant.

"And so it seemed to me that it would definitely be contrary to the interests of justice to exclude the first [2003], and to allow the more recent event [2011]. So turning to the more recent event, it seems to me, as I said, they both are admissible under 1109 and also 1101(b), based on motive, based on identity, based on the similarity in the method that was employed, and on the ever-escalating pattern that the People allege has occurred."

As to both the 2011 and 2003 incidents, the court rejected defendant's objections under section 352: "As to the more recent event, including the earlier event [2003], the analysis under 352, it was not really argued by the defense that there would be an undue consumption of time. And having read the police reports that were identified on the record, it doesn't appear to me that in relation to the trial as a whole, that there will be an undue consumption of time.

19

"It really seems to me that the only factor that's involved here is the probative value versus its prejudicial effect. And, of course, there's no dispute about its probative value . . . ." The court rejected defense counsel's suggestion that a stipulation as to the fact of the crime would make Garner's testimony irrelevant.

The court explained, "[I]n this case the stipulation does fall far short because motivation and intent and some of the key elements in the alleged crime and lesser includeds are not stipulated to, and so it seems to me that that path is not persuasive to the Court."

In sum, the court determined, "The standard is that it has to be unduly prejudicial. And in my view, the evidence of the [2003] incident . . . is not unduly prejudicial. The probative value far exceeds its prejudicial effect.

3. *Analysis*

Defendant contends that the trial court erred in admitting this evidence because it was "insufficiently probative under section 1101, subdivision (b), and insufficiently relevant for the purposes for which 'disposition' evidence" should be admissible under section 1109. Defendant contends that because the jury was going to see a video of the shootings themselves, the jury did not need to know about these incidents to refute a claim of heat of passion, to support the credibility of Garner, or to establish any of the section 1101, subdivision (b) factors of identity, motive, intent, and common plan and design. The Attorney General contends that there was no error, given that the uncharged acts by defendant against Ms. Garner were "triggered by her decisions to leave or abandon [defendant]" and were similar in character to what happened to Flores-Crose in this case. When Garner said she wanted to end her relationship with defendant, he committed domestic violence against her. When he felt rejected, he lashed out with

20

increasing vitriol and violence.  While the probative value is not overwhelming, we do not find the trial court abused its discretion in concluding that the uncharged acts of domestic violence were similar enough to have probative value to the charged crimes.

When the section 352 factors are weighed, the issue is not close.  The testimony from Garner did not confuse the issues in the case; the incidents were separated by time and victim.  Garner's testimony was relatively short and took up a very small portion of the jury's time.  Nor was it more prejudicial than probative.  Garner lived to tell the story of defendant's kicking, slapping, strangulation and threats, which caused fear but no injury. Flores-Crose did not.

The trial court gave the jury a full set of instructions on how to deal with the issue so that defendant would not be prejudiced.  The jury was specifically instructed on how to consider uncharged offenses and uncharged acts of domestic violence.  They were also instructed more generally on how to evaluate evidence, including evaluating conflicting evidence (CALCRIM No. 302), and cautioned that they must not let sympathy or prejudice influence their decision (CALCRIM No. 200).  We presume that jurors understood these instructions and followed them.  (*People v. Pearson* (2013) 56 Cal.4th 393, 414.)

Finally, defendant's assertion that the due process clause was violated on account of the court's admission of this evidence is not supported by reasoned argument or citation to the record.  Ordinarily, the " 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1014.) Defendant has not shown that this case is any exception.

21

## DISPOSITION

The judgment is affirmed.

_____

Miller, J.

WE CONCUR:

_____

Kline, P.J.

_____

Richman, J.

A155912, *People v. Williams*

23